Lawrence **ELMORE**, Appellant,

v.

**COMMONWEALTH** of Kentucky, Appellee.

Court of Appeals of Kentucky.

March 7, 1975.

Anthony M. Wilhoit, Public Defender, J. Vincent Aprile, II, Asst. Public Defender, Frankfort, for appellant.

Ed W. Hancock, Atty. Gen. Miles H. Franklin, Asst. Atty. Gen., Frankfort, for appellee.

CATINNA, Commissioner.

Lawrence Elmore and Johnny Collins were jointly indicted for the murder of William Naman Taylor. The trial court directed the jury to return a verdict finding Johnny Collins not guilty. The jury found Lawrence Elmore guilty of voluntary manslaughter and fixed his punishment at fifteen years' imprisonment. Elmore appeals from the judgment entered upon the jury verdict.

Elmore and Taylor were neighbors, living on Sexton's Branch of Rockhouse Creek in Letcher County. On Saturday, December 22, 1974, Elmore and Taylor embarked upon a hegira that eventually led to the death of Taylor. As early as 10 a. m. on that day they were observed riding around in a purple truck that belonged to Taylor. They were both "pretty drunk."

Taylor's grandson testified that at about 5 p. m. on that Saturday he helped Taylor and Elmore pull a car down to Elmore's

house. Elmore testified that this occurred about 3 p. m. The grandson testified that he was with Taylor and Elmore until about 8 o'clock on Saturday evening when the two men took him home in the purple truck. Taylor's widow saw him about 5 p. m. on Saturday at Sand Lick Gap where he and Elmore were trying to pull an old car with the purple truck. Both men were drinking at that time. Later, she saw Taylor, Elmore, and a son pulling the old car with the truck. When she returned from visiting a son, at about 10 p. m., she saw the truck parked at the Elmore house. At 10:30 p. m., she and a son saw the truck with two people in it go down the hollow and return a few minutes later.

Elmore's story of the day's events coincides with that of the other witnesses up until 5:30 or at the latest, 5:45, on Saturday evening. He and Taylor had been drinking heavily all day; they had pulled the old car which Elmore had purchased from one of Taylor's sons from Sand Gap to Elmore's home. Elmore later purchased the truck from Taylor, wrote him a check, and they agreed to finish up the deal on Monday. Taylor left the Elmore home at about 5:30 to 5:45 and walked down the hollow toward his home. After Taylor left, Elmore went to bed. He was extremely drunk and had no recollection of what happened after Taylor left. He denied being with Taylor's grandson until 8 o'clock on Saturday night but claimed that they took the boy home much earlier, approximately 5 p. m., when he and Taylor went to buy more whiskey. He said that if the truck was operated at any time after 5:45 p. m. it was without his knowledge.

Taylor did not go home Saturday night. On Sunday morning, one of his sons located the truck parked in Elmore's front yard. Elmore, who was still in bed drunk, informed them that he had purchased the truck the night before. However, he offered to pay them again and tendered five $20 bills. Taylor's sons demanded possession of the truck, and when Elmore would not give them the key, they used a pen knife to get the truck started and drove it to the Taylor residence where it remained until Monday. On Monday morning, the family commenced a search for Taylor. A son found his body in Rockhouse Creek below the steel bridge that crossed the creek at the mouth of Sexton's Branch. The son said his body was sixty feet below the bridge, while Tommy Wright, a detective for the Kentucky State Police, fixed the distance at 100 yards below the bridge. Detective Wright found blood on the floor and railing of the bridge and on the windshield and seat on the passenger side of the Taylor truck. An analysis of blood samples disclosed that the blood on the bridge and the truck was human blood and, further, that the blood in the truck was Type O human blood. Taylor's blood was Type O. Two wedges were found on the floorboard in the cab of the truck. Although the wedges appeared to have blood and human hair on them, an analysis limited the findings to the fact that the substance was blood. Wright located blood stains on a rug located on the porch of the Elmore house and on a wall in one of the rooms. Samples taken from these locations disclosed that the stains were dog blood. Elmore told Wright that he had killed a dog at the house and this accounted for these blood stains.

We are reversing this case because of erroneously given instructions, and as there will be another trial, we feel it advisable to dispose of other grounds raised by Elmore on this appeal.

At the conclusion of the trial the court instructed the jury as follows:

"If you shall believe from the evidence beyond a reasonable doubt that the defendant, Lawrence Elmore, in Letcher County, Kentucky and before the finding of the indictment herein, wilfully, feloniously and with malice aforethought and not in his necessary or apparently necessary self-defense, struck and beat William Naman Taylor with a steel wedge and that said William Naman Taylor presently died thereby, you will find the

defendant guilty—guilty of voluntary manslaughter if the striking and beating was not done with malice aforethought but in a sudden affray or in sudden heat of passion and upon provocation ordinarily calculated to excite passion beyond control. * * * ."

\* \* \* \* \* \*

"IV Although you may believe from the evidence beyond a reasonable doubt that the defendant, Lawrence Elmore, struck and beat William Naman Taylor with a steel wedge and that he died thereby, yet if you further believe from the evidence that at the time the defendant so struck and beat the said William Naman Taylor that he was so drunk that he did not have the capacity of forming an intention to kill the said William Naman Taylor with malice aforethought, then you should find the defendant guilty of voluntary manslaughter."

Elmore's counsel objected to the giving of the voluntary manslaughter instruction as set out in Instruction I, but did not object to the giving of Instruction IV. This case was tried before the opinion of this court in Richards v. Commonwealth, Ky., 517 S.W.2d 237 (1974). The only evidence in the entire record indicating that Taylor's death resulted from a sudden affray or in sudden heat of passion is to be found in the testimony of Harry Taylor, a grandson. Harry testified that when he helped Elmore and Taylor pull the old car down to Elmore's house at about 5 p. m. on Saturday afternoon, Elmore was attempting to buy the purple truck from Taylor but Taylor didn't want to sell "and they were arguing about it." The grandson testified that both of the men were pretty drunk and had been drinking all day.

■ After 5:30 to 5:45 p. m., or 8 p. m. if we are to believe Taylor's grandson, we lose all contact with both Taylor and Elmore. The record discloses no fact or situation which would in any way indicate that Taylor met his death after that time in a sudden affray or in sudden heat of

passion. Basically, all we have here is two men who dropped out of sight at sometime between 5:30 p. m. and 8 p. m. on Saturday. Elmore was next seen Sunday about 11 a. m. when he was located at home in bed and drunk. Taylor's body was not found until Monday afternoon. Consequently, there is no evidence to support the giving of a manslaughter instruction. While it has been held that where no eyewitness testifies the court should instruct as to murder, manslaughter, and self-defense, nevertheless the giving of a voluntary manslaughter instruction is proper only in those instances where there is evidence that will support the giving of the instruction. Cf. Thorpe v. Commonwealth, 301 Ky. 541, 191 S.W.2d 572 (1946); Trimble v. Commonwealth, Ky., 447 S.W. 2d 348 (1969); Cox v. Commonwealth, Ky., 491 S.W.2d 834 (1973); Richards v. Commonwealth, Ky., 517 S.W.2d 237 (1974). It was error upon the part of the court to instruct on voluntary manslaughter. It would appear to have been especially prejudicial in this case, because the jury returned a verdict finding Elmore guilty of voluntary manslaughter.

■ Instruction No. IV, which allowed the jury to find Elmore guilty of voluntary manslaughter if he was too drunk to entertain the malice required for a murder conviction, is no longer permitted. Richards v. Commonwealth, Ky., 517 S.W.2d 237 (1974).

■ Elmore asserts that the trial court should have sustained his motion for a directed verdict. While the evidence is entirely circumstantial, it is of sufficient probative value to justify submitting the case to a jury. Consider the facts that Elmore and Taylor had been together all day, drinking; they were last seen together; the truck was observed at Elmore's house on Saturday night and was still there Sunday morning after Taylor had disappeared; the wounds on Taylor's head conclusively establish that his death was other than accidental; the wedges in the truck; and the

blood on the wedges, the truck, and the bridge. All these circumstances so involve Elmore that this court is unable to say, as a matter of law, that the evidence was of such character that reasonable minds would not be justified in concluding that the person charged was guilty beyond a reasonable doubt. Cf. Moore v. Commonwealth, Ky., 488 S.W.2d 703 (1972). We are of the opinion that there was more than mere suspicion of Elmore's involvement in Taylor's death. The trial court properly overruled the motion for a directed verdict.

■ There is no merit in Elmore's claim that he was substantially prejudiced by the admission of the photographs of Taylor taken on the river bank and at the funeral home. This court has examined the photographs and found nothing about them that is inflammatory but, on the contrary, is impressed with the fact that they were of great assistance in determining the location and type of wound sustained by Taylor. Cf. Moore v. Commonwealth, Ky., 489 S.W.2d 516 (1972).

The question of the presence of dog blood in the Elmore residence presents a rather serious problem. The Commonwealth's attorney was fully aware of the fact that the blood at the house was dog, not human, blood. Wright testified that Elmore said that he had killed a dog at the house. Upon cross-examination of Elmore, the Commonwealth's attorney dealt at length with the presence of the dog blood, the manner in which it had gotten there, and as the dog had been the mother of some puppies, asked Elmore if he had killed the puppies. The court sustained an objection to this question; therefore, the Commonwealth's attorney was fully aware of the impropriety of this line of inquiry. Actually, it had nothing to do with the case and apparently was inserted to bolster the prosecution by depicting Elmore in a most unfavorable light. Finally, in his closing argument, the Commonwealth's attorney commented at length on the dog killing rather than the death of Taylor, the argument being in part as follows:

> " * * * I'm not quoting hearsay when I tell you that he sat on that witness chair right there and told you that some mother dog had crawled into their porch to make her home. She and her pups were there. Let's see if we can tell what happened there. This man said he took that dog and threw it against the wall of that house and killed it. I didn't ask him about the pups, but I think I know their fate, too."

An objection was made to this line of argument which the court promptly overruled.

■ The Commonwealth seeks to justify evidence regarding the killing of the dog and the pups and the dog blood at the house by arguing that if the blood was not human, it established the fact that Taylor was killed in the truck and not in the house. The Commonwealth already knew that this was dog blood, and it was absolutely unnecessary to insert this extraneous and nonessential evidence into the record. This court is of the opinion that proceedings of the type here outlined impinged upon the rights of Elmore and bordered upon prejudice. Should there be another trial of this case, all evidence concerning the existence of the dog blood, the dog, the pups, and any argument regarding the killing of the dog and pups will not be competent.

The judgment is reversed for further proceedings consistent with this opinion.

REED, C. J., and JONES, LUKOWSKY, PALMORE, STEPHENSON and STERNBERG, JJ., concur.

CLAYTON, J., dissents.