Eugene William GALL, Jr., Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Supreme Court of Kentucky.

Sept. 2, 1980.

As Modified On Denial of Rehearing
Oct. 14, 1980.

Jack Emory Farley, Public Advocate, Commonwealth of Kentucky, Edward C. Monahan, Erwin W. Lewis, Asst. Public Advocates, Frankfort, for appellant.

Steven L. Beshear, Atty. Gen., James L. Dickinson, K. Gail Leeco, Asst. Attys. Gen., Frankfort, for appellee.

## OPINION OF THE COURT

Eugene W. Gall, Jr., was convicted of murder and sentenced to death pursuant to the verdict of a jury under the two–stage trial procedure prescribed by KRS 532.025. In this appeal he advances many alleged errors and irregularities, contending that each and all of them require a reversal of the judgment. We shall limit our discussion to those we do not consider to be patently groundless.

## FACTUAL BACKGROUND

At about 7:35 a. m. on April 5, 1978, Lisa Jansen, a 12–year–old schoolgirl, left her home in suburban Cincinnati, Ohio, for school. She was missed very shortly thereafter when she failed to arrive at the home of a friend she had planned to meet on the way and it was ascertained that she had not gone directly to school. At about 9:25 a. m. that morning Mrs. Connie Puckett, while driving her automobile along Kentucky Highway 16 from Verona, Kentucky, toward her home in Walton, Kentucky, noticed a red jacket lying on the side of the highway near the intersection of Stephenson–Mill Road. She stopped and retrieved it, thinking that probably it belonged to one of the students attending the elementary school at Verona. She was positive that the jacket had not been there when she passed the same place a few minutes earlier on her way to Verona. Upon resuming her trip homeward she observed an open schoolbook lying in the road, stopped and picked it up. It bore the name of Lisa Jansen, and when Mrs. Puckett arrived back in Walton she telephoned the school at Verona. The school principal advised her that no one by the name of Lisa Jansen was enrolled there, but later in the day he called back and told Mrs. Puckett that a television newscast had reported a Lisa Jansen as missing. Mrs. Puckett then reported her discovery of the jacket and schoolbook to the Cincinnati police.

The distance from Lisa's home in Ohio to the Kentucky state line at Cincinnati was 10.9 miles, and from the state line southward via Interstate 75 to the place near Stephenson–Mill Road where her body was found the next morning is 22.6 miles. Gall resided at Hillsboro, Ohio, about 45 miles the other side of the Jansen home.

At about 10:15 a. m. on April 5, 1978, a man later identified as the appellant, Gall, entered a small grocery store at the crossroads village of Gardnersville, 17 miles or so by public roads from the vicinity of Stephenson–Mill Road (which consists of a loop leading off and then back to Highway 16), and robbed the storekeeper and her customers at the point of a .357–gauge magnum stainless–steel revolver. The storekeeper, who was familiar with this type of weapon, observed from the exposed portions of the magazine that it was loaded with hollow–point cartridges. As soon as the robber left, she telephoned the local headquarters of the Kentucky State Police and reported the incident. Within a matter of minutes Gall was encountered by Detective Joe Whelan, who turned around and followed, and then by Trooper Gary Carey, who had alighted from his cruiser and was attempting to block the highway. As Carey signalled the driver to halt Gall shot him once, got out of the Ford and shot him again, and then sped onward with Whelan emptying his gun into the rear of the fleeing car. Almost immediately other police officers took up the chase, and Gall was finally brought to bay when he attempted to make a U–turn in the town of Dry Ridge and one of the troopers rammed his cruiser into the Ford. The .357 revolver was lying on the floor of the Ford. Also on the floorboard of the Ford automobile the officer found a

cigar box and $112.88, the money taken at the store in Gardnersville. Gall had the further sum of $42.84 on his person. Subsequent laboratory tests established that a bullet removed from Trooper Carey's person had been fired from the revolver found in Gall's automobile.

Shortly following his arrest Gall, by reason of his police record, became a suspect in connection with the disappearance of Lisa Jansen. In 1970 he had been charged with several counts of rape and armed robbery in southern Ohio, had been found mentally incompetent to stand trial, and had spent some 19 months in a mental institution at Lima, Ohio, after which he entered a plea of guilty to those charges and spent five years in a state penitentiary at Lebanon, Ohio. He was 31 years of age at the time of Lisa Jansen's murder.

### PRETRIAL PROCEEDINGS

Lisa's body was found early on the morning of April 6, 1978. Gall, already under arrest, was charged with her murder and was indicted for that offense by the Boone County grand jury on April 27, 1978. At his arraignment on the same day, and following a plea of not guilty, the trial court granted the Commonwealth's motion for permission to procure various physical samples from Gall's person, including hair, saliva, fingerprints and blood. Counsel for Gall objected only with respect to blood sample, stating that he had no objection as to the hair, saliva and fingerprints. Thus we consider only the matter of the blood sample.

The Commonwealth's motion for permission to obtain these samples was supported by affidavits of the prosecuting attorney and a detective of the Kentucky State Police.

A divided court in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), held it permissible for a police officer acting with probable cause under exigent circumstances to have a blood sample taken by a physician from an arrested drunk–driving suspect. The 5th Amendment protection against self–incrimination

was held inapplicable because the majority of the court did not consider a surrender of blood as having testimonial import. 384 U.S. at p. 765, 86 S.Ct. at p. 1832. The 4th and 14th Amendment protection against unreasonable search and seizure did apply, but was held not to have been violated. In the absence, however, of exigent circumstances justifying immediate action without a warrant, the court indicated that the same precautions would be required as in the instance of a search warrant. That is, the justification must be determined by an informed, detached and deliberate judicial act. 384 U.S. at p. 770, 86 S.Ct. at p. 1835.

In this instance the trial court had before it an indictment charging Gall with the murder of Lisa Jansen and affidavits by the Commonwealth's Attorney and a detective of the Kentucky State Police stating that the physical samples were needed "for purposes of completing their investigation into the rape and death of Lisa Jansen." It seems to us that the relevance and importance of such evidence in a case involving rape are self–evident. We therefore hold that the order granting permission to obtain it from Gall's person was reasonable and was a valid basis for the subsequent admission of testimony derived from its analysis. Cf. *Thompkins v. State*, Ind., 383 N.E.2d 347, 351 (1979).

Also on the day of the arraignment the trial court, by agreement of the parties, appointed Dr. Robert Noelker, a psychologist, to examine Gall for the purpose of determining (a) whether he was mentally competent to stand trial and (b) whether at the time of the offense he had the mental capacity to appreciate the criminality of his conduct and to conform his conduct to the law. Contemporaneously the Commonwealth secured the services of Dr. Lee Chutkow, a psychiatrist, for the purpose of determining his competence to stand trial. A hearing on the first of these questions was held on May 26, 1978, following which the court found Gall to be competent and set the case for trial on the merits.

On September 6, 1978, defense counsel moved for a change of venue on the ground that by reason of local publicity Gall could not be given a fair trial in Boone County or in any of the surrounding northern–Kentucky counties. We have examined the affidavits, counteraffidavits and exhibits (numerous newspaper articles) filed in connection with this motion and are of the opinion that the trial court did not abuse its discretion in declining a change of venue.

Gall cites several U. S. Supreme Court cases in which state court convictions were overturned because the "trial atmosphere . . . had been utterly corrupted by press coverage." Cf. *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). In *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), prejudice was presumed from the circumstances under which the trials were held. "In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings." *Murphy, supra*, at 421 U.S. 799, 95 S.Ct. 2035. Here, there was no repeatedly–televised confession of the accused as in *Rideau*, and no "circus atmosphere" or "courthouse given over to accommodate the public appetite for carnival" as in *Estes* or *Sheppard*. The juror exposure to media accounts of Gall's prior convictions or of his being charged with the murder of Lisa Jansen do not support a presumption that he could not or did not have a fair trial in *Boone County. Cf. Murphy, supra*, at 421 U.S. 799, 95 S.Ct. at 2035; *Spirko v. Commonwealth*, Ky., 480 S.W.2d 169, 171 (1972).

The constitutional standard of fairness required that Gall have "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). In *Irvin*, which was the United States Supreme Court's first reversal of a state conviction owing to prejudicial pretrial publicity, eight of the 12 jurors eventually selected thought the defendant guilty when examined during voir dire. By contrast, none of the 14 jurors chosen to hear Gall's case thought he was guilty when preliminarily questioned. Gall thus fails to show "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." Cf. *Irvin, supra*, 366 U.S. at p. 723, 81 S.Ct. at p. 1643.

In support of his contention that by reason of the pretrial publicity a pattern of deep and bitter prejudice against him prevailed throughout the community in which he was tried and convicted, Gall asserts that out of 51 veniremen examined 17 were excluded for expressing the opinion that he was guilty.[1] The point is not persuasive. In *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), holding that the petitioner had not been deprived of due process, the court commented as follows:

"In the present case, by contrast, 20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt. [fn] This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Murphy, supra*, at 421 U.S. 803, 95 S.Ct. at 2038.

Finally, in terms of this particular proceeding, the very fact that in a capital case the court was able to complete a 14–member jury (including two alternates) from only 51 veniremen utterly refutes the existence of such community prejudice as would prevent the selection of a proper jury.

---

1. For the sake of accuracy, it does not necessarily follow that these veniremen, because they had preconceived opinions, were of the opinion that Gall was guilty. Our count, incidentally, indicates that 52 veniremen were called, but one was excused on hardship grounds without being further questioned.

At a pretrial hearing on September 13, 1978, shortly prior to the date set for the trial (September 19), the court again heard Dr. Noelker, who testified that there had been no change with regard to Gall's mental capacity and that he was still competent to participate in the proceeding.

## JURY SELECTION

The case was called for trial on September 19, 1978, beginning with the voir dire of prospective jurors, which continued through September 26, 1978. The selection of 14 jurors (including two who were ultimately withdrawn upon final submission of the case to the jury) was completed after 51 veniremen had been examined on voir dire. All but two of the 51 expressed some degree of familiarity with the case. Seventeen had formed opinions with respect to Gall's guilt or innocence and were excused for that reason. Two were excused because they would be unable to render a verdict of capital punishment, and one because he could not say whether he would or would not be able to impose the death penalty. One who had been examined and one whose name had not been reached for voir dire were excused because they had violated the court's admonition not to discuss the case. Six were stricken on peremptory challenge by the Commonwealth and ten by the defense.

RCr 9.40 gives the Commonwealth six and the defense nine peremptory challenges in a felony case in which an alternate juror or jurors are impaneled. In this instance the trial court allowed each side one more. The Commonwealth used six of its seven strikes and the defense exercised its entire 10.

It would not be possible for a fair-minded person to read the record of this voir dire without being impressed by the earnest effort of the trial judge to accomplish the selection of an unbiased jury. It is, in our opinion, quite beyond question that Gall did in fact have as impartial a jury as could have been found anywhere. Nevertheless, we cannot overlook the possibility that a technical error was committed in the exclusion of the prospective juror Correll for the reason that he could not say whether he would or would not be able to consider a verdict recommending the death penalty. Cf. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 399 (1976); *Adams v. Texas*, —— U.S. ——, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

After a series of questions put to Mr. Correll by the prosecuting attorney had failed to elicit a definite answer as to whether his conscience would permit him to "consider the death penalty as is required by law," the trial court asked him, and he answered, as follows:

Q "Would your feelings absolutely preclude you from imposing a sentence of death under any circumstances, any circumstances that you could think of?"

A "I just don't know, sir, whether it would or would not, really."

The depth of Mr. Correll's irresolution was emphasized by his reply to a later question by defense counsel, as follows:

Q "Mr. Correll, the court, in essence, is asking you if there is any case where you would consider imposing the death penalty. For instance, if Hitler were on trial here today for killing all the Jews, you could consider imposing the death penalty in that case couldn't you?"

A "I would be undecided, sir. At this point."

It occurs to us that if a prospective juror will not say whether he can or cannot consider without prejudice the options from which he must choose in arriving at a verdict, he should be disqualified. The very least assurance to which the public is entitled is that he will exercise an honest discretion in resolving each issue submitted to him. Yet the effect of such equivocation is that on this important issue the juror will not give an assurance that he is able to exercise any discretion because he is not sure that his mind is open at the beginning. Surely it is elementary that a juror must be able to enter upon his duties with an open mind. It would seem beyond cavil that any

court in the country would dismiss a prospective juror who could not say whether he would or would not be able to consider a verdict resulting in a prison sentence. The reason is that such a juror could not be an impartial juror, and it seems to us that fundamental justice guarantees to the public impartial jurors in capital cases as well as in less serious proceedings.

In *Adams*, supra, a statute required prospective jurors in a capital case to state under oath "that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact." The trial judge excused a number of prospective jurors who were unable or unwilling to take the oath. Some were excused because they admitted they would be "affected" by the possibility of the death penalty and others "because they were unable positively to state whether or not their deliberations would in any way be 'affected.' " This was held to be a violation of *Witherspoon.*

Under the Texas statutes applicable in *Adams* the jury first determined guilt or innocence and then, after a finding of guilt in a capital degree and a further hearing on aggravating and mitigating circumstances, answered three questions. If all three were answered in the affirmative, the trial judge was required to impose a sentence of death, otherwise a sentence of life imprisonment. Our statutes also provide for a bifurcated trial in which the jury first determines guilt and, after a finding of guilt, hears evidence bearing upon aggravating and mitigating factors. If it finds the existence of one or more aggravating circumstances as specified in KRS 532.025(2)(a), it is authorized to recommend the death penalty, but the trial court is not bound to impose it.

The trial court cannot sentence a defendant to death unless the jury, by a unanimous verdict, has found beyond a reasonable doubt the existence of one or more of the aggravating circumstances listed in KRS 532.025(2)(a). KRS 532.025(3). There being no requirement that the trial judge abide by the jury's recommendation, once the jury has found an aggravating circum-

stance the trial judge has the discretion either to sentence the defendant to death, or to life imprisonment, or to a term of not less than 20 years in prison. KRS 532.030, 532.035.

So it may be seen that the jury's function with regard to the ultimate sentence is more limited here than it was under the Texas statute in *Adams*. Nevertheless, its determination that an aggravating circumstance existed is a *sine qua non*, and its recommendation of the death sentence, though not binding on the trial judge, obviously carries great weight. With regard to the applicability of *Adams*, vel non, there is a dispositive distinction, we feel, between a prospective juror who admits he may be *affected* by the death penalty, or does not know whether he would or would not, and one who is unable to say even that he can *consider* that option. It is our opinion, therefore, that *Adams* does not apply to this case, and that *Witherspoon* does not require the acceptance of a juror who is unable to say that he can exercise an open-minded discretion with regard to the vital issues he will be called upon to decide. Cf. *State v. Ross*, La., 343 So.2d 722, 726–7 (1977).

It will be recalled that the Commonwealth left one of its peremptory challenges unexercised. Surely, had the trial court denied its motion to strike Correll for cause, it would have used that challenge. Under similar circumstances the Supreme Court of Georgia held possible *Witherspoon* errors to have been harmless. *Alderman v. State*, 241 Ga. 496, 246 S.E.2d 642 (1978). See also *State v. George*, La., 346 So.2d 694 (1977). We reach the same conclusion in this case.

## TRIAL PROCEEDING–GUILT PHASE

During the course of the *voir dire* Gall made it known to the trial court that he wished to participate in the conduct of his defense, but without giving up the assistance of his appointed counsel. The court acceded, and Gall thereafter questioned various witnesses, made motions, interjected objections, and entered into discussions between court and counsel at the

bench. At the time Gall initiated this development Dr. Noelker, who evidently maintained a fairly continuous observation of his conduct throughout the course of the trial, advised the trial court that Gall was getting pretty close to being incompetent, in that his desire to act the part of an attorney might very well be the result of underlying delusional patterns typical of paranoia. He believed, however, that Gall had not yet reached the point of incompetency to participate rationally in his defense, and there was no further question on that issue until the second day of the trial, at which time defense counsel moved for a continuance on the ground that Gall had become incompetent to stand trial. Dr. Noelker, called in support, testified in chambers that Gall had now transcended the bounds of reality, that although he continued to be competent in all other respects, "in my opinion he has disassociated himself from this trial and he is participating in it much more as the attorney than the defendant."

A major factor conducing to Dr. Noelker's conclusion in this respect was that Gall did not have much faith in the defense of insanity, preferring rather to cast his main defense along the lines of reasonable doubt.[2] He had some theories, apparently, that to Dr. Noelker and his counsel were bizarre. At this time both court and counsel interrogated Gall very closely in chambers, and the court arranged to have him examined that evening by a psychiatrist, Dr. Kenneth Lanter, following which Dr. Lanter appeared in chambers and testified that in his opinion Gall was mentally competent to participate in his defense and quite capable of making intelligent decisions in so doing.[3] Being convinced, both on the basis of his own observation and the opinion of Dr. Lanter, that Gall was not incompetent to participate in his defense,

the trial judge denied counsel's motion for a continuance.

Thus far we do not perceive any failure by the trial court to protect the defendant from a possible inability, by reason of mental incompetence, to stand trial. RCr 8.06 provides that if at any time in the course of criminal proceedings there appear reasonable grounds to believe the defendant is insane, "the proceedings shall be postponed and the issue of insanity determined as provided by law." In their brief on this appeal, counsel for Gall contend that an incident which occurred during Gall's cross—examination of Detective Charles Seay constituted reasonable grounds to believe that Gall had indeed lost his senses and that the trial court of its own volition should have stopped the trial and conducted another sanity hearing.

Seay was the police officer who found the little girl's body on the morning of April 6, 1978. It so happened that he lived in the neighborhood and was familiar with the scene of the crime. When he testified, the details of the Gardnersville episode and the recovery of Gall's .357–caliber revolver had been described by other witnesses. It had also been revealed by the prosecuting attorney in his opening statement to the jury that Lisa Jansen had been shot twice, once through the head and once in the back, and that expert examiners had determined from the steel jacket of the bullet fired into her back that the shot had been fired from the weapon found in the automobile Gall was driving at the time of his arrest. On cross—examination Gall elicited from Officer Seay that he also carried a .357–caliber magnum revolver which was capable of firing the same type of ammunition as had been found in Gall's automobile. Then, Seay having also admitted that when he discovered Lisa's body his suspicions had already centered on Gall, Gall ended the cross—examination in this melodramatic fashion:

---

2. Gall's theory was that the defense of insanity assumes commission of the criminal act, which he did not want to admit. He may not have been so dumb, much less insane.

3. Illustrating his aptitude in this respect, during this inquiry into his competence Gall moved

the court that he and the jurors be conducted to the scene of the crime in order that he might become acquainted with it. The motion was granted, thus enabling Gall to exploit his knowledge of details he would have had no reason to know unless he had visited the scene.

"Okay, now you have testified today that the difference between a .38–caliber bullet and a .357 bullet, as far as the .357 would be, would have more penetrating power. Detective Seay, it took you ten minutes from 8:32 to 8:42 to locate the body of Lisa Jansen down a deserted road, heavily used by–as a lover's lane. I charge you with shooting that second shot through Smith & Wesson Revolver .357 using a .38–caliber bullet to put that second one in to use as evidence. No further questions, Your Honor."

Considering what the public has become accustomed to seeing on television nowadays, we do not think this ploy by Gall, in an attempt to lay a seed of doubt in the mind of some one or more of the jurors, was so outlandish [4] as to raise a question of his mental competence. Even if Gall's attorneys had so moved, which they did not, this episode did not require the trial court to conduct another hearing on the issue of his sanity.

We turn now to the remaining questions relating to the admissibility of evidence, having previously disposed of the matter of the blood–sample.

■ Gall contends very strongly that the evidence of the Gardnersville incident should not have been admitted because it involved another crime and was not necessary in proving the rape and murder of Lisa Jansen. The Commonwealth sought to uphold the admissibility of this evidence on the ground that it supported an inference that Gall needed money to fund an escape. It is unnecessary to resort to such a chimerical theory. It is a settled principle that competent, relevant testimony will not be excluded on the mere ground that it reveals, to the defendant's obvious prejudice, an unrelated crime or crimes. The subject was thoroughly discussed in *Jones v. Commonwealth*, Ky., 554 S.W.2d 363, 366–368 (1977), which is dispositive of the issue in this case. The Gardnersville escapade provided several important items of evidence connecting Gall with the Jansen murder. It put him in the same neighborhood in the same morning. It turned up, in Gall's possession, the murder weapon. The bullet removed from the wounded police officer and the steel jacket removed from Lisa's body were fired from the same gun, which would have served to identify the man who shot Trooper Carey as being also the murderer of Lisa even if the weapon itself had not been recovered. Moreover, Gall's apparent sangfroid during the robbery was relevant to the issue of possible emotional disturbance on his part. The argument that this series of events should not have been admitted in evidence is absurd. So is the point that its salient essentials were not in "actual dispute." Whether Gall was the murderer certainly was in actual dispute, and the Commonwealth was entitled to introduce whatever evidence was available to sustain its burden of proving the identity of the guilty party. There was no error in the admission of the entire Gardnersville episode.

The only other contentions worthy of mention with respect to the propriety of evidence admitted by the trial court relate to photographs and to the testimony of Joan Woods. Neither, in our opinion, raises a serious question.

■ The objectionable photographs consisted of color slides introduced in connection with the testimony of the clinical pathologist who had conducted the post–mortem examination of Lisa's body. We have examined them and do not find them so gruesome or prejudicial as to outweigh their probative value as a part of the doctor's description of what he had found. In recent years this court has followed a rather liberal policy with respect to the admissibility of photographs that are otherwise relevant. See *Moore v. Commonwealth*, Ky., 489 S.W.2d 516, 518 (1973); *Napier v. Commonwealth*, Ky., 426 S.W.2d 121 (1968);

---

**4.** It was not established until later in the trial, when the pathologist who had autopsied the body testified, that the two gunshot wounds had been inflicted "within essentially the same time frame." Neither, however, before that time had there been any revelation that the shot in the back had been the "second shot," as Gall so accurately identified it.

*Salisbury v. Commonwealth*, Ky., 417 S.W.2d 244 (1967). It is no answer to say that defense counsel offered to stipulate the essential facts proved by the pathologist and illustrated by the photographs, hence they were unnecessary. The Commonwealth has a right to prove its case to the jury even when the defendant pleads guilty. The defendant is not entitled to erase the ugly parts of the picture and substitute words in their place. In order for a jury to be able to size up a case fairly and wisely it must be allowed to gain a reasonable perspective, and that can best be done by permitting it to see an unadulterated picture. We are of the opinion that the photographs here in question were admissible.

Joan Woods, age 12, was the friend who was waiting to go to school with Lisa Jansen when Lisa disappeared, and was called as one of the first witnesses establishing the chronology of events. Apparently she was emotionally upset and had been crying when she took the witness stand. Defense counsel objected to her appearance as a witness on the ground that she was simply being used to "upset the jury," and he offered to stipulate "that she didn't see Lisa that morning." When she described her relationship to Lisa as her "best friend" she began to cry again, whereupon the prosecuting attorney held her hand in order to help restore her self-control. She was able to complete her brief appearance as a witness without further incident.

We agree that Joan's testimony was not vital. It was relevant, because it proved the time of Lisa's disappearance, but it was merely cumulative of testimony already given by Lisa's mother. The prosecuting attorney might better have chosen discretion above valor, but we do not view it as an abuse of discretion on the part of the trial court to let the little girl testify. Nor do we apprehend that the grown men and women who comprised the jury could have been so light-headed as to be seriously affected in their ultimate deliberations by this little vignette of girlish hysteria.

Gall makes several contentions with regard to the court's instructions to the jury. First he says that the court should have given a peremptory instruction of acquittal on the ground that as a matter of law the evidence established his insanity at the time of the offense. On that particular issue, however, Gall had the burden of proof, and we certainly cannot hold that the postfactum opinions of his experts were so compelling that reasonable minds could not fail to be convinced by them. Moreover, considering the nature of chronic paranoid schizophrenia, the mental illness from which he was alleged to be suffering, and the testimony to the effect that it not only was of long standing but probably not curable, the observations made by Dr. Chutkow on the basis of his examination of Gall on April 30, 1978, cast considerable doubt that he was afflicted with that disease of April 5, 1978. We recognize, of course, that one may be "insane" and yet competent to stand trial, and that the direct purpose of this examination was to determine his competence to stand trial, but the fair import of Dr. Chutkow's testimony was that he found no evidence of paranoid schizophrenia existing at that time. Even if Dr. Noelker's testimony were accepted at face value, he conceded that there were periods of remission in which Gall could function in a legally sane manner. Gall himself did not take the stand, and there was no eyewitness testimony showing the circumstances immediately attending the rape and murder.

Gall presents two arguments on the subject of extreme emotional disturbance. The first is that the Commonwealth did not produce any evidence that he did not act under the influence of extreme emotional disturbance, hence the evidence was not sufficient to support the trial court's instruction on murder. The second is that the "extreme emotional disturbance" phase of the murder instruction was fatally deficient in omitting the words, "the reasonableness of which is to be determined from the standpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." Cf. KRS 507.020(1)(a).

Under the law of this state prior to adoption of the Kentucky Penal Code, effective January 1, 1975, a homicide that would otherwise have constituted wilful murder was classified as the lesser degree of voluntary manslaughter if it occurred in a sudden affray or in sudden heat of passion and upon such provocation "as would have naturally overcome and suspended the self–control of a man of fair, ordinary and average disposition or will power or cause such a one to act rashly or without due deliberation or reflection." *Tarrence v. Commonwealth*, Ky., 265 S.W.2d 40, 51 (1954).

Voluntary manslaughter has been replaced in the Penal Code by manslaughter in the first degree, which is defined in KRS 507.030. In lieu of sudden affray or sudden heat of passion upon reasonable provocation, the mitigating circumstance now reducing the crime from murder to manslaughter is that the defendant "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." KRS 507.-030(1)(b).

■ According to the Commentary prepared by the drafter of this portion of the Penal Code, "The most significant change brought about by subsection (1)(b) is an abandonment of the common law requirement that the killing occur in 'sudden heat of passion' upon 'adequate provocation.' Adopted in its place is the requirement that the homicide be committed 'under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse.' Under this standard, which was borrowed from the Model Penal Code, mitigation is not restricted to circumstances which would constitute provocation 'in the ordinary meaning of the term, i. e., an injury, injustice or affront perpetrated by the deceased upon the actor.' . . . In other words, it is possible for *any event, or even words*, to arouse extreme mental or emotional disturbance, as that phrase is used here." (Emphasis added.)

"A second significant change . . . is the addition of a subjective element to the test used for determining the mitigation issue. The test set forth is an objective one: Is there a 'reasonable explanation or excuse' for the mental or emotional disturbance? But, in making that determination, the triers of fact are required to place themselves in the actor's position as he believed it to be at the time of his act. This is intended to replace the common law requirement that the provocation must be of a nature calculated to inflame the passions of the ordinary reasonable man." KRS 507.030, *Commentary* (1974).

■ Although the substantive factors reducing murder to manslaughter are thus made different by the new statute, the procedural aspects remain unchanged. The Commonwealth still has the burden of proof, but in order to justify an instruction on the lower degree there must be something in the evidence sufficient to raise a reasonable doubt whether the defendant is guilty of murder or manslaughter. "Evidence suggesting that a defendant was guilty of a lesser offense is, in fact and in principle, a defense against the higher charge, though it is not a 'defense' within the technical meaning of that term as used in the Kentucky Penal Code, cf. KRS 500.-070." *Brown v. Commonwealth*, Ky., 555 S.W.2d 252, 257 (1977).

An instruction on voluntary manslaughter is proper "only in those instances where there is evidence that will support the giving of the instruction." *Elmore v. Commonwealth*, Ky., 520 S.W.2d 328, 331 (1975). "We have adopted the rule that where the evidence is wholly circumstantial and the facts lead inescapably to the conclusion that the crime, whoever committed it, was murder, there being no evidence of a struggle or other unusual circumstances from which the jury might infer a lesser degree of the crime, the accused is not entitled either to a manslaughter or self–defense instruction." *Brown v. Commonwealth*, Ky., 275 S.W.2d 928, 933 (1955). That was the law prior to .

the Penal Code, and it continues to be the law under the Penal Code. An instruction on murder need not require the jury to find that the defendant was not acting under the influence of extreme emotional disturbance unless there is something in the evidence to suggest that he *was*, thereby affording room for a reasonable doubt in that respect. Cf. *Brown v. Commonwealth*, Ky., 555 S.W.2d 252, 257 (1977).

 In this case there was no eyewitness evidence of the killing, and the defendant himself did not testify. Assuming that he was the guilty party, as the jury found him to be, there is not a shred of evidence to suggest that he was acting under the influence of an emotional disturbance, or that there were any circumstances existing at the time of the killing to provoke or stimulate such a disturbance, except for the evidence that he suffered from a mental illness from which the jury could have found, but did not find, that he was insane. The nature of that illness was chronic paranoid schizophrenia, which was characterized not only as "an extreme emotional disturbance," but "the most severe personality disorder that we are able to diagnose."

There is much to be said for the proposition that an emotional disturbance inhering in a mental illness is not the kind of an emotional disturbance contemplated by the statute, in view of its historical development and the expression in the Commentary to the effect that it may be aroused by "any event, or even words," as quoted above. Assuming, however, that a mental disorder, whether or not it amounts to legal insanity, may constitute a reasonable "explanation or excuse" for extreme emotional disturbance, it was incumbent upon the trial court to require the negating of that factor in its instruction on murder, which was done. That is not to say that once the issue is raised (by evidence sufficient to ground a reasonable doubt) the Commonwealth must meet it with countervailing evidence. Unless the evidence raising the

issue is of such probative force that otherwise the defendant would be entitled as a matter of law to an acquittal on the higher charge (murder), the prosecution is not required to come forth with negating evidence in order to sustain its burden of proof. Cf. *Brown v. Commonwealth*, Ky., 555 S.W.2d 252, 257, fn. 6 (1977). Otherwise it would never be possible to convict a defendant of murder if there were no eyewitnesses and if, for example, he testifies that he acted in self-defense, or was intoxicated out of his mind, or was acting under the influence of extreme emotional disturbance.[5]

 While it is true that the "extreme emotional disturbance" phase of the murder instruction did not include the additional statutory language, "the reasonableness of which is to be determined from the standpoint of a person in the defendant's circumstances as the defendant believed them to be," we are of the opinion that the omission was proper. Obviously that particular language is appropriate only when there is evidence suggesting that the emotional disturbance was precipitated by some event or circumstance the defendant believed to exist. In this case there was no evidence to suggest that the appellant's motivation involved any "belief" on his part with regard to the circumstances that induced the alleged emotional disturbance. *Ratliff v. Commonwealth*, Ky., 567 S.W.2d 307 (1978), is factually distinguishable in this particular respect.

 Although the form of the instruction given by the trial court on first-degree manslaughter (based on extreme emotional disturbance) does not conform to this court's conception of proper instructions in that respect (see, e. g., Palmore and Lawson, Kentucky Instructions to Juries, Sec. 2.01, Instructions 2 and 5, and Sec. 2.02, Instructions 2 and 3), it was given exactly as offered by defense counsel, and it did provide a vehicle by which the jury could have found Gall guilty of a lesser offense

5. On all of these issues, when raised by the evidence, the Commonwealth has the burden of

proof beyond a reasonable doubt.

than murder if it had been so disposed. So, even though we are not entirely convinced that Gall was entitled to any instruction whatever based on the mitigating theory of emotional disturbance, we are of the opinion that under the circumstances of the case there was no substantial error in the manner in which it was submitted to the jury.

■ Instruction No. 3 presented the defense of insanity, and was in correct form except for its use of the words, "by a preponderance of the evidence" in lieu of "from the evidence." Again, this portion of the instruction was given exactly as requested by Gall. Now, as a result, we find his appellate counsel crying out that "preponderance of the evidence" should have been defined. This court disapproves the use of that terminology. "From the evidence" is sufficient in all civil cases, and with the qualifying phrase "beyond a reasonable doubt" it is sufficient in a criminal case. We would not for that reason, however, reverse this judgment. There is no reason to suppose or suspect that the jurors were ignorant bumpkins.

■ Instruction No. 4 paraphrased that portion of RCr 9.56 referring to reasonable doubt as to degree, but did not specify which of the two offenses covered by the preceding instructions was the higher degree.[6] No doubt any juror with common sense would be able to figure that out for himself, but here again we encounter a claim of prejudice that could easily have been avoided. A careful instruction on the matter of degree should clarify the relationship between the murder and first–degree manslaughter instructions by stating in substance that if the jury believes beyond a reasonable doubt that the defendant would be guilty under the murder instruction except for its having a reasonable doubt as to whether he was acting under the influence of extreme emotional disturbance, it shall not find him guilty of murder, but shall find him guilty of first–degree manslaughter. See e. g., Palmore and Lawson, Kentucky Instructions to Juries, Sec. 2.01, Instruction 5, and Sec. 2.02, Instruction 3.

Though a better instruction on doubt as to degree could have been given, Instruction No. 4 did meet the requirements of RCr 9.56 in that particular respect and was not prejudicially erroneous.

■ Gall's appellate counsel complain also that the trial court did not define the term "reasonable doubt" and did not instruct the jury in so many words that the Commonwealth bore the burden of proof. There was no error in either respect. The subject was discussed in *Whorton v. Commonwealth*, Ky., 570 S.W.2d 627, 631–632 (1978), and there have been no authoritative decisions since that time to suggest either that "reasonable doubt" must be defined or that specific reference should be made to the burden of proof.

Several points are made with regard to the alleged misconduct of the prosecuting attorney. It is said, for example, that he invaded Gall's right to a fair trial by belittling his defense of insanity and by misportraying various items of evidence in his concluding remarks to the jury. To be mercifully brief, we do not find in this record any conduct by the prosecuting attorney that could be said to have been inconsistent with Gall's right to a fair trial.

■ Another argument is that by informing the prospective jurors during voir dire that the Commonwealth would not introduce any confession the prosecuting attorney was in effect commenting wrongfully on Gall's silence. We do not draw such an inference. There is nothing particularly wrong in advising the jurors that the prosecution will rely on circumstantial evidence.

■ When he was arrested at the end of the Gardnersville incident Gall made several statements with respect to the weapon he had in his possession, the number of shots he had fired at Trooper Carey, and the reason he had fired them. During direct examination of the officer to whom these statements had been made the prosecuting attorney asked if he had tried to talk to Gall at greater length "about other mat-

---

**6.** Neither did the instruction offered by counsel for Gall.

ters," to which the witness replied, "Yes, but he wouldn't talk." "In other words, that is all he would say?" "That is all he said." We do not construe this exchange as an attempt to comment on Gall's silence, nor do we think that it was likely to draw the jury's attention to Gall's silence.[7]

During voir dire one of the prospective jurors (a Mrs. Koenig, upon whom the defense later exercised one of its peremptory challenges), under interrogation by defense counsel, said that she could acquit Gall on the ground of insanity "if he was taken care of . . . if he were taken out of society." Counsel thereupon attempted to inform Mrs. Koenig that in the event of an acquittal on the basis of insanity certain civil commitment procedures are available, but upon objection by the prosecuting attorney the court would not permit him to continue. No further effort was made during the proceedings to enlighten the jury in this respect. Citing the fact that this court has held it permissible for the prosecutor to point out in his closing argument that in the event of an acquittal on grounds of insanity there is no assurance that the defendant will not soon be at large again, *Jewell v. Commonwealth*, Ky., 549 S.W.2d 807, 812 (1977), but has held also that the defendant is not entitled to an instruction advising the jury that in the event of his being found not guilty by reason of insanity he can be committed, *Edwards v. Commonwealth*, Ky., 554 S.W.2d 380, 383–384 (1977), Gall argues that we have created a legal monstrosity which deprives the defendant of due process. It should be understood, however, that *Edwards* does not prohibit defense counsel from reminding the jury that if the defendant is acquitted on the grounds of insanity at the time of the offense, and if he lapses into that condition again, there are legal means to bring about his commitment, because that is the simple truth. But it cannot be truthfully said that he *will* be committed, because if he is sane enough to be participating in the trial there is very little likelihood of his being validly found insane immediately thereafter. The most that defense counsel can say, and we have never held that he cannot say it, is that if after the defendant is acquitted there appear reasonable grounds to believe he is insane and ought to be committed to an institution, he can be tried in a civil commitment proceeding. We adhere, however, to the view that the prospects of what may or can happen after the verdict do not belong in the instructions given by the court to the jury. There is no sensible due process question in this respect.

## TRIAL PROCEEDINGS–PENALTY PHASE

In the second phase of the trial, after the jury had found Gall guilty of murder, the Commonwealth introduced no further evidence except for a synopsis of his previous felony convictions, which was admitted by stipulation. The prosecuting attorney informed the jury in a brief opening statement that the only statutory aggravating circumstance on which it would rely[8] was that the murder had been committed in the course of rape and that the evidence in that respect had been sufficiently developed in the guilt phase of the trial.

The defense introduced Gall's mother, father, and divorced wife, all of whom testified in considerable detail about

7. It was later developed through the testimony of Dr. Noelker and the psychiatrists that Gall claimed to have no recollection of being in northern Kentucky on the morning in question.

8. One of the aggravating circumstances enumerated in KRS 532.025(2)(a) was that "the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions." This was not submitted to the jury, however, because the trial court was persuaded that it was unconsti-tutionally vague, as the Georgia court had decided in *Arnold v. State*, 236 Ga. 534, 224 S.E.2d 386, 391–392 (1976). The stipulated synopsis of prior felony convictions was relevant only because one of the mitigating circumstances listed by KRS 532.025(2)(b) was, "The defendant has no significant history of prior criminal activity." Only by proving the criminal history of a defendant could the Commonwealth preclude defendant's reliance upon this particular mitigating circumstance.

his personal history. Dr. Noelker appeared again and testified that probably Gall could function reasonably well in a structured prison environment. In addition, affidavits of two other persons who had been subpoenaed but could not appear [9] were read into evidence. One was that of a university professor in the field of sociology and correctional psychology who had specialized in criminology and capital punishment. He said, in substance, citing text materials in support, that capital punishment is not a deterrent to crime and that other methods of dealing with convicted criminals have proved to be of greater value to society. The other absent witness was a retired investigative news reporter and writer who had personally witnessed 22 executions by electrocutions between 1933 and 1957. His affidavit consisted of graphic descriptions illustrating the gruesome nature of the process.

In its instructions the trial court confined the consideration of aggravating circumstances to whether the murder was committed in the course of rape, but allowed the jury to consider four specific mitigating circumstances for which there was some semblance of evidentiary basis and a fifth or catch–all category, "whether or not there are other mitigating circumstances presented through the evidence, not listed above." The instructions made it clear that the jury could not recommend the death penalty unless by unanimous verdict it found beyond a reasonable doubt that the aggravating circumstance existed, but that even in that event, and even though it might believe the aggravating circumstance outweighed such mitigating circumstances it might find to exist, it still did not have to recommend the death penalty.

■ The jury retired to deliberate at 4:47 p. m. At 5:05 p. m. it submitted a question to the court on the subject of

parole or pardon and was advised that the court could not enlighten it beyond what was contained in the written instructions. At 7:23 p. m. the jury returned a verdict finding that Gall had committed the offense of murder while engaged in the commission of rape [10] and that none of the mitigating circumstances set forth in the instructions existed, and recommending the death penalty. Four days later the trial court entered judgment accordingly, from which this appeal followed.

■ Whereas the jury found no mitigating circumstances, Gall contends that two such circumstances existed as a matter of law and that the jury should have been so directed. These two circumstances, both statutory, are (1) the offense was committed under extreme mental or emotional disturbance even though not sufficiently so to constitute a defense, and (2) at the time of the offense the defendant's mental capacity was impaired by disease or defect even though not sufficiently to constitute a defense. Again, as we have observed earlier in this opinion, there was a sharp conflict in the evidence as to whether Gall was insane at all, and there was no evidence whatever to suggest extreme emotional disturbance unless he was in fact insane. Whatever may be our personal viewpoints with regard to his mental condition, we are not permitted to substitute them for what the jury found under substantial conflicting evidence. If the jury was not compelled, as the trier of facts, to find Gall insane, certainly it was not compelled to find any emotional disturbance, nor can we say it was bound to find a *quasi* or diminished degree of either.

It is further argued that in view of both the expert testimony and Gall's history of mental illness, and with such other resources as may have been available after the verdict, the trial court should have ex-

---

9. The third absent witness was an Ohio attorney who had represented Gall in 1970. Counsel did not offer in evidence the affidavit showing what his testimony would have been. At the beginning of the sentencing phase of the trial Gall moved for a continuance by reason of the absence of these witnesses, and on this appeal he contends that the denial of a continu-

ance was a prejudicial error. We do not think so.

10. We construe the statutory language of KRS 532.025(2)(a) pertaining to rape as meaning that the murder was committed incident to a rape, as distinguished from its having been committed during the physical act of sexual intercourse.

ercised its discretion to inflict a lesser sentence than death. Though counsel alludes to the analogy of Pontius Pilate, it must be remembered that Gall was not tried by a rabble. We cannot say that the trial court abused its discretion in this respect.

Perhaps the real problem lies in the very nature of the defense of insanity. It may be too much to ask of any set of men or women to make a dispassionate assessment of a criminal defendant's mental condition, especially in the setting of a revolting offense he has committed. Some of our sister states have endeavored to meet the problem by authorizing a verdict of "guilty but mentally ill" (short of legal "insanity") under which the sentence is not affected but the defendant while serving it may be confined as long as may be necessary in a mental institution. We commend that approach to our own General Assembly.[11] Under the law as we now have it, however, it is the responsibility and province of the trial jury to make a black–or–white determination of insanity, and it is the prerogative of the legislative representative of the people to have it so.

Gall contends that for several different reasons our statutes authorizing the death penalty are unconstitutional, under both the federal and state constitutions. The existence of "capital" offenses is recognized in the 5th Amendment of the United States Constitution and in Sec. 16 of the Constitution of Kentucky. While there are a good many judicial pragmatists in this country who evidently feel no compunction in amending the federal constitution to suit their own notions of justice, we continue to believe that such authority belongs only to the people. The fight over capital punishment belongs in the political arena, where the will of the public can best be ascertained and expressed. It should not be resolved by judicial policy or by the exercise of raw judicial power. In our opinion it is not a constitutional issue and we do not find it unconstitutional.

One last contention is that the trial court failed to comply with the presentencing procedure required by KRS 532.050, an argument that is refuted on the face of the statute, which applies only to conviction for a felony "other than a capital offense."

## REVIEW OF SENTENCE

KRS 532.075 requires this court to review any death sentence and to consider the punishment as well as any errors raised on appeal. For its assistance in this regard KRS 532.075(6) directs it to compile the records of "all felony offenses in which the death penalty was imposed after January 1, 1970, or such earlier date as the court may deem appropriate." The list of the cases considered pursuant to that directive is attached as an appendix to this opinion.[12]

The Public Advocate of the state, whose office represents Gall on this appeal, has kept up an incessant drumbeat contending that he is constitutionally entitled, incident to the appeal of each death sentence, to have access to the materials compiled for this court pursuant to KRS 532.075(6). We took great pains to answer that contention in *Ex parte Farley*, Ky., 570 S.W.2d 617 (1978). See also *Ross v. State*, 233 Ga. 361, 211 S.E.2d 356, 359–360 (1974).

There have been no legal executions in Kentucky since 1962, and in every instance in which a death penalty has come before this court since January 1, 1970, either the conviction has been set aside on grounds of error or the sentence has been reduced to life imprisonment because the statute was found to be invalid, usually under *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Gall is the 17th person who has appealed a death sentence to this court since the beginning of 1970. We have made a comparative study of his sentence with reference to the other 16. Considering both the nature of the crime and the defendant, Gall's sentence is not excessive or disproportionate to the penalty imposed in similar cases. The evidence supports the

---

11. Cf. Mich.Comp.Laws Ann., Sec. 768.36; Indiana Code 35–5–2–6, eff. 9–1–80.

12. Among the many points raised in Gall's voluminous brief is the suggestion that the statu-

tory imposition of these procedures invades the judicial rule–making power. It may be so, but as a matter of comity we have no objection to complying with them.

jury's finding of an aggravating circumstance as defined by KRS 532.025(2)(a)2, and the sentence does not appear to have been imposed under the influence of passion, prejudice, or any other arbitrary factor.

The judgment is affirmed.

PALMORE, C. J., and AKER, CLAYTON, LUKOWSKY, STEPHENSON and STERNBERG, JJ., sitting.

All concur.

STEPHENS, J., having participated in the proceeding in his capacity as Attorney-General, did not take part in the consideration or disposition of the appeal.

### APPENDIX

| Name of Case | Date of offense |
| --- | --- |
| Scott v. Commonwealth, Ky., 495 S.W.2d 800 (1973) | 6–30–69 |
| Leigh v. Commonwealth, Ky., 481 S.W.2d 75 (1972) | 10–25–69 |
| Lenston and Scott v. Commonwealth, Ky., 497 S.W.2d 561 (1973) | 12–30–69 |
| Call v. Commonwealth, Ky., 482 S.W.2d 770 (1972) | 3–2–70 |
| Caldwell v. Commonwealth, Ky., 503 S.W.2d 485 (1972) | 4–18–70 |
| Tinsley and Tinsley v. Commonwealth, Ky., 495 S.W.2d 776 (1973) | 5–2–70 |
| Galbreath v. Commonwealth, Ky., 492 S.W.2d 882 (1973) | 5–8–71 |
| Caine and McIntosh v. Commonwealth, Ky., 491 S.W.2d 824 (1973) | 9–13–71 |
| Hudson v. Commonwealth, Ky., 597 S.W.2d 610 (1980) | 2–10–75 |
| Meadows v. Commonwealth, Ky., 550 S.W.2d 511 (1977) | 5–25–75 |
| Self v. Commonwealth, Ky., 550 S.W.2d 509 (1977) | 7–30–75 |
| Boyd v. Commonwealth, Ky., 550 S.W.2d 507 (1980) | 9–17–75 |
| Smith v. Commonwealth, Ky., 599 S.W.2d 900 (1980) | 7–1–78 |