Brian Keith MOORE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Supreme Court of Kentucky.

June 15, 1982.

Jack Emory Farley, Public Advocate, William M. Radigan, Rodney McDaniel, Michael A. Wright, Asst. Public Advocates, Frankfort, for appellant.

Steven L. Beshear, Atty. Gen., Frankfort, for appellee; James L. Dickinson, Linda C. Wimberly, Asst. Attys. Gen., Frankfort, of counsel.

## OPINION OF THE COURT

Brian Keith Moore was convicted of murder, kidnapping, and robbery in the first degree. Under the judgment of the Jefferson Circuit Court, he was sentenced to death for murder, life imprisonment for kidnapping, and twenty years imprisonment for robbery. This appeal is before us as a matter of right.

## PROCEDURE

On August 15, 1979, the Jefferson County Grand Jury returned a three count indictment against Moore. The first count alleged that on August 10, 1979, the defendant had committed the capital offense of kidnapping by "unlawfully detaining Virgil Harris with the intent to accomplish or advance the commission of a felony." KRS 509.040. Count two alleged that on August 10, 1979, Moore, while armed with a pistol, committed robbery in the first degree by threatening the use of physical force on Virgil Harris in the course of committing a theft. KRS 515.020. The final count charged that on the same day, Moore committed murder by intentionally causing the death of Virgil Harris by shooting him with a pistol. KRS 507.020.

Following his plea of not guilty to all three counts, Moore filed numerous pre-trial discovery and suppression motions. The trial court's rulings on certain of these motions will be discussed in the appropriate parts of this opinion.

## STATEMENT OF FACTS

The proof introduced by the Commonwealth showed that the decedent, Virgil Harris, was a 77 year-old man who owned and operated an ice cream shop located on Seventh Street in Louisville. He had a regular daily routine which consisted of arriving at the store at 8:30 a. m., going to the bank at about 10:00 a. m., and then to the A&P grocery store. On August 10, 1979, Harris left his store at 11:20 a. m., driving his 1978 maroon Buick. He went to the Liberty National Bank in Shively where he made a deposit and picked up several rolls of coins. After leaving the bank, he purchased bananas at the A&P.

Shortly before noon, an eyewitness in the A&P parking lot saw a young man answering the description of appellant standing near the door of a maroon car, pointing a gun at the driver, an "older" man. Later in the day, appellant was seen driving a maroon Buick. He told a witness that the car belonged to his uncle and that he (appellant) was going to take over the payments.

Lynn Thompson and Kenny Blair, friends of appellant, lived together in an apartment on Shady Villa Drive in Louisville. Appellant spent the night with them on August 8 and 9. Thompson testified that on the afternoon of August 10, Moore came to the apartment carrying a paper sack which contained a money bag, a gun, a clip, several rolls of coins, and some bananas. Appellant stated to her that he had just robbed a "place" of $250.00. He later told Blair that he had followed a man to his car and demanded his money. The man gave appellant the money and then pulled a mask from appellant's face. Appellant told Blair that he wasn't going to let the man live and testify against him, and that he drove the man to the Jefferson Hill Road where he shot and killed him.

Following this conversation with appellant, Blair, who was seeking probation for a recent felony conviction, called his attorney, Murray Turner, and informed him that he had some information about a murder. Turner contacted Judy Feldkamp, an assistant Commonwealth's attorney, and sought a "deal" whereby the Commonwealth would recommend probation for Blair in return for his testifying about the murder.

The police discovered Virgil Harris' car in the parking lot at the Shady Villa Apartment, and found that appellant had the car keys in his possession. He also was wearing Harris' wristwatch. Blair took the police to the scene of the murder, claiming that appellant had taken him there. A battery of scientific tests introduced by the Commonwealth showed that appellant had recently fired a gun, that he had soil on his trousers which was similar to that at the crime scene, and that appellant's fingerprints were in Harris' car and on the coin wrappers. Following appellant's arrest, he made a verbal confession. Evidence of the confession was admitted by the trial judge following a suppression hearing.

Appellant denied that he was guilty and claimed that Kenny Blair was the culprit. There was evidence that appellant was a regular drug user, and he claimed that he was "high" on the day of the crimes. Appellant denied having fired a gun and stated that he had lent the gun to Blair. He admitted driving Harris' car, but stated that Blair had stolen it and that he had borrowed it from Blair. He denied having made the confession to the police. A witness for appellant, James Lofton, who was a prisoner in the Jefferson County Jail, testified that Blair had told him (while both were incarcerated) that he himself had robbed and killed Harris and that he was setting appellant up for Harris' murder.

Appellant has raised thirty alleged errors with respect to both the guilt and the sentencing phases of the trial. While we have examined all points raised, we will discuss only those which have any substance. We have found those not discussed to be without merit.

I. DID THE TRIAL COURT ERR IN FAILING TO CONDUCT A HEARING AS TO WHETHER APPELLANT DESIRED TO WAIVE HIS RIGHT TO THE ASSISTANCE OF COUNSEL?

On the first day of the trial, appellant filed a hand-printed "Notice-Motion-Order," the pertinent part of which is as follows:

"Comes the Defendant, by Brian K. Moore pro se, and respectfully moves the Court to grant a hearing under the provisions of *Wake v. Barker*, 514 S.W.2d 692 ([Ky.] 1974); and *Farretta* (sic) *v. California* [422 U.S. 806], 95 S.Ct. 2525 [45 L.Ed.2d 562] (1975), to determine whether the defendant desires to waive counsel and proceed pro se or wishes to make a limited waiver of counsel, specifying in the latter instance the extent of services he requires for the record." [1]

The document was not signed. Appellant also tendered a prepared order to "determine the extent of representation to be provided by the Public Defender." The trial court took no action on the motion.

Appellant now argues that under *Faretta, supra*, the constitutional right of a defendant to waive his right to assistance of counsel was violated by the failure of the trial court to grant a hearing. We do not agree.

In *Faretta*, the Supreme Court concluded that the protection of the Sixth Amendment includes the right of an accused to waive counsel to represent himself. In *Wake v. Barker, supra,* we concluded that the best procedure, upon an unequivocal request to proceed *pro se*, or an unequivocal request to limit the role of counsel, is for the trial court to conduct a hearing to determine whether the waiver is being made knowingly and intelligently. However, the principles of *Faretta* and *Barker* only become applicable when the request to proceed *pro se* or with counsel in a limited fashion is timely made and is unequivocal.

It cannot be doubted that neither requirement was met in the present case. The unsigned motion was filed on the morning of the trial, which was clearly too late for the court to call and hold a hearing. More importantly, the very wording of the motion shows that the appellant *did not know* if he wanted to waive counsel or to

---

1. It is obvious that the language in the motion was picked up nearly verbatim from *Wake, supra,* but it did not state an unequivocal desire to proceed *pro se.*

limit the role of counsel. This is not an unequivocal request within the meaning of *Faretta*. There being no request, no hearing was necessary.

## II. DID THE TRIAL COURT ERR IN FAILING TO DIRECT THE COMMONWEALTH TO DISCLOSE CERTAIN POLICE REPORTS AND STATEMENTS OF WITNESSES PRIOR TO TRIAL?

On September 17, 1979, appellant filed a written request for twenty-three separate items of pre-trial discovery. The trial court ordered discovery "as to all items and/or information to which the defendant is entitled." In response to the trial court's order, the Commonwealth provided all information requested except in certain cases where it argues that it was not required, under Kentucky rules of criminal procedure, to provide such information. The requests denied dealt with:

(1) Written or oral statements by any witnesses implicating appellant.

(2) Local, state and FBI arrest records of all persons the Commonwealth intended to call as witnesses.

(3) All investigative reports of police and statements of witnesses.

On February 28, 1980, appellant filed another pre-trial discovery motion for a disclosure of any and all information that could be used for the possible impeachment of Commonwealth witnesses. Such request was denied by the Commonwealth. It is claimed by appellant that he was denied due process of law by the failure of the Commonwealth to provide this information.

■ Pre-trial discovery in Kentucky is based on the provisions of RCr 7.24 and 7.26. With respect to the three requests made on September 17, by appellant and denied by the Commonwealth, RCr 7.24 is clear and dispositive. Section (2) provides in pertinent part:

This provision does not authorize pre-trial discovery or inspection of reports, memoranda, or other documents made by officers and agents of the Commonwealth in connection with the investigation or prosecution of the case, or of statements made to them by witnesses or prospective witnesses (other than the defendant).

The information at issue comes precisely within the prohibition in this section of the rule. Simply stated, the appellant is not entitled to the information sought. *Robinson v. Commonwealth*, Ky., 490 S.W.2d 481 (1973).

■ With respect to the pre-trial discovery of impeachment evidence, the rule is also clear. RCr 7.26 provides for such information to be made available to a defendant after, and only after, the witness has been called by the Commonwealth. Here again the appellant was not entitled to the information sought.

■ One other related allegation of error is made by appellant. Roy Schaefer, Jr., a corrections officer in Jefferson County, testified that he overheard the appellant bragging to other inmates that he had shot a man and that the victim was a "pig's father." This evidence was not revealed to appellant in response to his pre-trial discovery motion and he claims this also was error. Appellant concedes that oral statements are not discoverable under RCr 7.24 as interpreted by *McGuire v. Commonwealth*, Ky.App., 573 S.W.2d 360 (1978). He argues that the *McGuire* decision is incorrect, and in effect wants a change in policy. We decline to make such a change and hold to the reasoning in *McGuire*, based on the plain wording of RCr 7.24.

## III. DID THE TRIAL COURT ERR IN EXCLUDING FOR CAUSE TWO JURORS BECAUSE OF THEIR VIEW OF CAPITAL PUNISHMENT?

■ In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Court ruled that a sentence of death cannot be carried out if the jury which imposed it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty. Whether an exclusion is justified under *Witherspoon* is a mixed question of law and fact. Unless

**432**

the prospective juror is "unmistakably clear" in his view that he could not vote for the death penalty, he cannot be excluded. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

We will examine the voir dire examination of both prospective jurors who were excused for cause by the trial court because he felt that they were, indeed, unmistakably clear in their view that they could not vote for the death penalty.

■ Mildred Hardin was the first prospective juror. The following colloquy occurred:

Q. 6 ... and what I would like to ask you is do you have any moral, religious or conscientious scruples about imposing the death penalty?

A. Yes, I do...

Q. 7 Are you saying that if chosen as a juror you could not, under the facts in this case, or any other case, at least consider each of the penalties the judge would tell you you had to consider, including the death penalty?

A. Yes, sir.

Q. 8 Are you saying you could not? And we are not asking you to commit yourself to telling us which verdict or penalty you might recommend, you understand that, but we are simply asking you, if the judge told you you had to consider 20 years or life, or the death penalty, you are saying you could not consider the death penalty?

A. That's right.

. . . . .

Q. 15 Do you understand that all I am asking is whether you would, in good faith, conscientiously, do as the judge instructed you, and sit down and look at each available penalty, and consider it, and then vote your conscience?

A. *With the death penalty included?*

Q. 16 Yes.

A. I couldn't. (TE, Vol. I, p. 83) [Emphasis added].

It is clear to us that Mrs. Hardin was unmistakably opposed to the death penalty, and was properly excused for cause under *Witherspoon.*

■ The other excused juror was Evelyn Bowles. The trial judge asked Mrs. Bowles, "if the instructions warranted, and the evidence warranted, would you be able to consider the death penalty." She answered, "I would have to say no." During voir dire, on several occasions, she gave a similar response when asked if she could vote for the death penalty. A typical response is as follows:

Q. 15 I'm going to have to ask you this, pin you down. Could you in this case, or in any case, ever consider the death penalty?

A. I'd have to answer no.

The trial court ruled, and we agree, that she also was unequivocally opposed to the death penalty. See *Gall v. Commonwealth,* Ky., 607 S.W.2d 97 (1980).

## IV. DID THE TRIAL COURT ERR IN REFUSING TO CONDUCT A SUPPRESSION HEARING RELATED TO THE ALLEGED ILLEGAL ARREST OF APPELLANT?

Officers were told that Kenny Blair had information that the appellant had robbed and killed a man named Virgil who owned an ice cream store and drove a red car. The homicide reportedly occurred at 4:30 p.m. on August 10, 1979. The officer investigating an independent missing person's report on Virgil Harris determined that Harris owned an ice cream store and was last seen in a 1978 maroon Buick. Blair gave the officer his address and informed him that appellant would probably be there. When the police first arrived at the apartment, the maroon Buick was in the parking lot. When appellant arrived he removed a pistol from his trousers and concealed it in the car. A search of appellant revealed a set of the decedent's car keys.

■ There is no doubt that, under the totality of the facts, the police had every right to arrest appellant. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), *Commonwealth v. Eilers*, Ky., 503 S.W.2d 724 (1974).

Very shortly before the trial, appellant requested a hearing to suppress the statements obtained from appellant based on the alleged illegal arrest. The motion was made pursuant to RCr 9.78, and was denied by the court. The rule provides in part:

If at *any time* before a trial a defendant moves to suppress, *or during trial* makes timely objection to the admission of evidence consisting of (a) a confession or other incriminating statements alleged to have been made by him to police authorities ... *the trial court shall conduct an evidentiary hearing* outside the presence of the jury .... (emphasis added).

 During a previous *Miranda* hearing, several references were made to the arrest, although the issue of the legality of the arrest was not raised. Subsequent to that hearing, appellant's counsel assured the court, on several occasions, that there would be no requests for additional evidentiary hearings. The Commonwealth argues that because the matter was peripherally raised at the *Miranda* hearing and because appellant assured the court that there would be no other hearings requested, that, "the motion was too late." The provisions of RCr 9.78 are mandatory. According to the rule, if the accused at "anytime" before trial or "during trial" makes a request, the trial court "shall conduct a hearing." The trial court should have conducted a hearing, even though the request was made late, and even though the appellant had assured the court that no further motions would be made.

However, because in our view the facts clearly establish that the arrest was legal, we believe that the error was harmless and that there was no prejudice to the appellant's rights. *Moore v. Commonwealth,* Ky., 569 S.W.2d 150 (1978).

V. DID THE TRIAL COURT ERR WHEN IT FAILED TO INSTRUCT THE JURY ON THE ELEMENT OF EXTREME EMOTIONAL DISTURBANCE?

Appellant's argument here is that the absence of extreme emotional disturbance is an essential element of the offense of mur-

der, and that the trial court's refusal to include this instruction was reversible error. We do not agree.

*Henley v. Commonwealth,* Ky., 621 S.W.2d 906 (1981) is dispositive of this contention. In *Henley* we said,

However, an instruction setting out the mitigating circumstance of extreme emotional disturbance does not have to be given unless there is 'something in the evidence sufficient to raise a reasonable doubt whether the defendant is guilty of murder or manslaughter.' *Gall v. Commonwealth,* Ky., 607 S.W.2d 97, 108 (1980). See also *Ratliff v. Commonwealth,* supra [Ky., 567 S.W.2d 307]; *Edmonds v. Commonwealth,* Ky., 586 S.W.2d 24 (1979), and *Thomas v. Commonwealth,* Ky.App., 587 S.W.2d 264 (1979). *A defendant accused of murder is not automatically entitled to a first-degree manslaughter instruction. We must examine the record to determine if there is any evidence which could reasonably be interpreted to show that the appellant, when he killed Mrs. Parrish, was operating under extreme emotional disturbance. Id.,* at page 908. (Emphasis Added)

 An examination of the record reveals that there is not a shred of evidence to show that at the time of the homicide appellant was operating under extreme emotional disturbance. Therefore, no instruction was required.

VI. DID THE TRIAL COURT ERR BY FAILING TO DIRECT A VERDICT OF ACQUITTAL ON THE CHARGE OF KIDNAPPING IN VIEW OF THE KENTUCKY KIDNAPPING EXEMPTION STATUTE?

KRS 509.050, the so-called kidnapping exemption statute, is as follows:

A person may not be convicted of unlawful imprisonment in the first degree, unlawful imprisonment in the second degree, or kidnapping when his criminal purpose is the commission of an offense defined outside this Chapter and his interference with the victim's liberty occurs

immediately with and incidental to the commission of that offense, unless the interference exceeds that which is ordinarily incident to commission of the offense which is the objective of his criminal purpose.

■ The purpose of this statute is to prevent prosecutors from misusing the kidnap statute to secure greater punitive sanctions for rape, robbery, and other offenses than are otherwise available. See commentary, KRS 509.050; *Griffin v. Commonwealth*, Ky., 576 S.W.2d 514 (1978). *Griffin* reiterates the three pronged test of the exemption statute. All three requirements listed in KRS 509.050 must be met.

■ It is conceded by the Commonwealth that the first test is satisfied because appellant did intend to rob Virgil Harris. Only after Harris pulled the mask from appellant's face was he kidnapped. The kidnapping and murder were intended to prevent an identification of appellant. The kidnapping was not "incidental" to the robbery. Not every robbery involves a kidnapping, and vice versa. We thus conclude that the second *Griffin* test is not met.

Appellant fails to clear the third "hoop" of KRS 509.050 as well. The murder of the victim clearly exceeds the deprivation of liberty ordinarily incident to a robbery. *Griffin, supra.*

## VII. DID THE TRIAL COURT ERR IN EXCLUDING CERTAIN EVIDENCE IN THE PENALTY PHASE OF THE TRIAL?

Following testimony of friends and relatives of appellant about his deprived and unstable childhood, the appellant called to the stand Rev. George Wilson. Upon inquiry as to what Rev. Wilson's testimony would be, counsel for appellant stated as follows:

"He will be asked questions whether or not a number of different considerations or factors that would be considered in making a determination, one way or the other, on capital punishment. The lack of serious criminal record, his youthfulness, all these different factors."

The court refused to admit the testimony because he felt that this was not mitigating evidence but was, instead, an instruction as to how the jury ought to consider and weigh the factors used to determine whether to give the death penalty.

By avowal, the witness testified that persons from lower economic backgrounds should be treated fairly. He explained that appellant's abandonment by his mother and his placement in foster homes caused him great difficulties in maturing spiritually and psychologically. He also felt that appellant was so young that, if given a chance he would redeem and reform himself, and that capital punishment would "close off" such possibility of change. The witness had only met appellant briefly, twice. Most of this information came from appellant's counsel.

■ The statutory provision for the admission of evidence of mitigating circumstances is KRS 532.025, which provides in pertinent part:

(2) In all cases of offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, *any mitigating circumstances otherwise authorized by law* and any of the following statutory . . . mitigating circumstances. . . .

\* \* \*

(b) Mitigating Circumstances
1. The defendant has no significant history of prior criminal activity.

\* \* \*

8. The youth of the defendant at the time of the crime.

The avowal testimony clearly shows that among other things, Rev. Wilson testified about the relative youth of the appellant at the time of the crimes (21 years old) and his lack of criminal background. Both of these items appear in the statute as potential mitigating circumstances. Even though the testimony may have been cumulative, and even though he had only a brief acquain-

tance with appellant, the exclusion of this testimony specifically ruled out what the statute specifically allows.

In view of our disposition of this case, we direct that, in the event of a re-trial, the testimony of the Rev. Wilson, as it applies to the statutory mitigating circumstances, shall be admitted.

## VIII. DID THE TRIAL COURT ERR BY PERMITTING THE CROSS–EXAMINATION OF A DEFENSE WITNESS AS TO A RECENT FELONY CONVICTION AND PENDING FELONY CHARGES?

It will be remembered that the appellant's main defense was an alibi in the sense that he claims to have been "set up" by the alleged actual killer, Blair. To corroborate such testimony, he introduced, as his main witness, James Lofton. Lofton testified that he was a fellow inmate in the Jefferson County Jail with Kenny Blair, whose statements to the police led to appellant's arrest, and whose testimony about appellant's admission that he robbed and killed Virgil Harris was a major part of the Commonwealth's evidence. Lofton testified that Blair himself was the killer.

On cross-examination of the appellant, the following colloquy occurred:

Q. 182 What is James Lofton in jail for, Mr. Moore?

A. I don't really know.

Q. 183 You do know, don't you?

A. No.

In overruling appellant's objection to this line of questioning the trial court explained by saying that since he had allowed the defense to try to show motive on the part of the prosecution witness, Lynn Thompson, in "fairness" it should afford the Commonwealth the same right. The cross-examination continued:

Q. 184 You are aware, Mr. Moore, that Mr. Lofton goes on trial in circuit court here on March 31st for kidnapping, a capital murder and robbery, now, aren't you?

A. No, sir.

Q. 185 You are not aware of that at all?

A. I am not aware he goes to trial, no sir.

The testimony as to the witness's forthcoming trial was the first step taken by the Commonwealth to attack the veracity and impugn the motives of James Lofton, who was the key witness for the defense. Following Lofton's testimony that Kenny Blair had admitted to him that he, Blair, had committed the crimes, cross-examination began.

Q. 48 Mr. Lofton, you mentioned a minute ago about a speedy trial and being in jail here a long period of time?

A. Yes, sir.

Q. 49 In fact, one of the reasons you haven't been tried sooner is you escaped, didn't you, from jail?

A. I've been here since that escape three years.

Q. 50 And also, Indiana took you over there and tried you on their cases?

A. Yes, Sir, when I was over there.

Q. 51 And you were convicted in Indiana for robbery, murder, and arson, weren't you?

A. Yes, sir, as a co-defendant.

Q. 52 Any you got life, plus 21 years in the penitentiary, didn't you?

A. Yes, I did.

\* \* \* \* \* \*

Q. 53 Now, on March 31st of this year, the Commonwealth of Kentucky is going to try you for kidnapping, robbery, and murder, and seek the death penalty, aren't they?

A. Along with William Appleby, yes, sir.

The trial court overruled appellant's objection, stating that "I allowed each side some leeway in trying to show motive, and I think that same consideration should be extended here."

During re-cross-examination, the following questions and answers were permitted:

Q. 71 Were you convicted by a jury for murder over in Indiana?

A. As a co-conspirator, yes.

Q. 72 You killed a woman over in Indiana, didn't you?

A. I did not, no, sir.

Q. 73 You were convicted by a jury for that crime, weren't you?

A. Yes.

Q. 74 You axed her to death, or used a hatchet?

A. I did not, no, sir. I'm not on trial for that again, am I. There will be another trial, I'm sure.

Appellant's counsel moved for a mistrial, which was denied. The basis of the court's ruling was that the questions were asked not only to impeach the witness, but also to show motive and bias.

Without any admonition, the jury was allowed to hear that Lofton, a key defense witness, had been convicted in Indiana of robbery, arson, and the axe murder of a woman, and that he was an escapee from jail, who was soon to go on trial for murder, robbery and kidnapping.

■ In view of appellant's motion for a mistrial and the serious prejudice resulting from the admission of this testimony in a capital case, we find that failure to formally object to this line of questioning is not fatal to review. *Stone v. Commonwealth*, Ky., 456 S.W.2d 43 (1970).

■ The admission of this evidence was plainly improper for impeachment purposes. In *Cotton v. Commonwealth*, Ky., 454 S.W.2d 698 (1970) we limited the use of prior felony convictions for impeachment:

"[T]he rule in *Cowan* [*Cowan v. Commonwealth*, Ky., 407 S.W.2d 695] should be modified to the extent of allowing impeachment of a witness, including a defendant in a criminal case, by proof of conviction of felonies that rest on dishonesty, stealing or false swearing...."
*Id.*, p. 701.

The impeaching crime must be a felony conviction, and not a pending charge. *Iles v. Commonwealth*, Ky., 476 S.W.2d 170 (1972). Homicide and escape are not impeaching offenses. *Payne v. Commonwealth*, Ky., 509 S.W.2d 264 (1974). Therefore the evidence was improperly admitted.

■ The trial court ruled that, in addition to its use for impeachment purposes, the challenged evidence was admissible to show motive and bias. It is true that in Kentucky the broad rule allowing admission of evidence of interest or bias can override the prohibition against impeachment through particular prior acts. *Leach v. Commonwealth*, 129 Ky. 497, 112 S.W. 595, 597 (1908). However, there must be some genuine interest or bias to be shown, whether it be a pecuniary interest, *Current v. Columbia Gas of Kentucky*, Ky., 383 S.W.2d 139 (1964); some hostile motive such as revenge; hope of lenience from the state in a pending case, *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), or some other bias toward or against the parties or the litigation in question. *Faulkner v. Commonwealth*, Ky., 423 S.W.2d 245 (1968). *Sparks v. Commonwealth*, 193 Ky. 180, 235 S.W. 767 (1921).

■ Here, Lofton's testimony for the defendant, not the Commonwealth, given at a time when serious charges were pending against him, could bring him no profit. He was, if anything, testifying against his own best interests.

■ Nor were questions concerning the nature of Lofton's past crimes proper simply to show some speculative general bias against the Commonwealth, presumed to exist because of Lofton's criminal status. If that were a sufficient showing, the bias exception would swallow the *Cotton* rule whole in every case, and the details of a witness's past crimes would always be admissible.

■ Even if the evidence had constituted a proper showing of bias, it was unnecessarily detailed and improperly inflammatory. In *Holt v. Commonwealth*, Ky., 259 S.W.2d 463, 465 (1953) we suggested guidelines for the admission of such evidence:

"It is competent on the cross-examination of a witness to elicit facts tending to show any bias or friendship of the witness for the party for whom he testified, and to show hostility towards the party against whom he is called. The scope and extent of cross-examination for this purpose rests within the sound discretion of

the court. However, no more of the facts and circumstances should be admitted than are necessary to give a fairly intelligent understanding of the cause, nature and effect of the influence on the witness; but the door is not thrown wide open to prove in detail the reasons therefor, or to go into the merits of the controversy. 58 Am.Jur. 'Witnesses' § 715, pp. 386, 387; also see Annotations, 74 A.L.R. 1157."

See, also, *Parsley v. Commonwealth*, Ky., 306 S.W.2d 284 (1957). Questions about Lofton's having axed a woman to death far exceeded these guidelines.

■ Since we have adduced that the admission of the testimony was erroneous, we must determine if its admission was prejudicial. Lofton's testimony was the chief prop upon which the appellant's defense stood. His testimony corroborated appellant's story about Blair having committed the crimes in question. The jury could, of course, discount appellant's testimony, if it chose to, because of his obvious motive. But what of Lofton's testimony? What motive would he have for lying? When the Commonwealth took aim on Lofton's testimony, by showing that he had been convicted for three felonies in Indiana, one an axe murder, had escaped from jail in Kentucky, and was about to stand trial in Kentucky for murder, kidnapping and robbery, what effect would this have on the jury's evaluation of Lofton's testimony? To ask this question is to answer it. They would not believe him. His credibility would be destroyed.

We conclude that the admission of the evidence was not only erroneous, but also was prejudicial to the appellant and to his constitutional right to a fair trial.

## IX. WERE CERTAIN REMARKS OF THE COMMONWEALTH'S ATTORNEY IN HIS FINAL ARGUMENT TO THE JURY IMPROPER AND PREJUDICIAL?

Appellant argues that portions of the prosecutor's closing argument did not comply with the fundamental fairness requirement of due process.

Following appellant's arrest, his interrogation was taped in part. In a subsequent evidentiary hearing, the trial court excluded parts of the tape. The admissible part of the tape was played to the jury as part of the prosecution's case. In his closing argument, the prosecutor commented,

"He (the appellant), denies it today on the stand but in the recorded statement to the police on Monday, he told them that Blair had given him the gun and he hid it in his waistband. I *know you didn't get to hear all the tape recorded statement. I wish you could have.*" (Emphasis Added)

Later in his argument he made an additional reference to the tape "... you heard that part of the tape. *Wish you could have heard it all.*" (Emphasis Added).

The other contested part of the prosecutor's closing argument deals with his statement of his personal opinion of the defense witness, James Lofton:

"James Lofton who is one of the most dangerous and vicious killers that it has ever been my experience to see in a courtroom and says believe that man," (in reference to appellant), James Lofton, birds of a feather flocking together." (TE 964)

■ It is a fundamental precept that a prosecutor must conduct himself with "... due regard to the proprieties of his office and to see that the legal rights of the accused, as well as those of the Commonwealth, are protected." *Bowling v. Commonwealth*, Ky., 279 S.W.2d 23, 24 (1955). The principles under which the conduct of a prosecuting attorney is judged are well stated in *Niemeyer v. Commonwealth*, Ky., 533 S.W.2d 218, 222 (1976):

One of the finest offices the public can give to a member of the legal profession in this state is that of Commonwealth's Attorney. Its very status becomes a mantle of power and respect to the wearer. Though few are apt to wear it lightly, some forget, or apparently never learn, to wear it humbly. No one except

for the judge himself is under a stricter obligation to see that every defendant receives a fair trial, a trial in accordance with the law, which means the law as laid down by the duly constituted authorities, and not as the prosecuting attorney may think it ought to be.

In spite of a ruling of the trial court that part of the tape recording was inadmissible, the prosecutor twice told the jury that he "wished" that they could have heard those parts which had been excluded. The only inference is that the inadmissible part of the tape contained incriminating evidence. The effect of these comments was to negate and circumvent the ruling of the trial court and to try the appellant by innuendo. The decisions of courts, until overruled, must be respected and obeyed by trial counsel. This standard applies, a fortiori, to those men and women who represent the Commonwealth in criminal prosecutions. We have no hesitation in declaring that the comments were improper and prejudicial to the rights of the defendant.

We also decide that the comments of the prosecutor related to James Lofton were improper. The personal opinion of the prosecutor as to the character of a witness is not relevant and is not proper comment. *Barnett v. Commonwealth*, Ky., 403 S.W.2d 40 (1966).

The judgment of the trial court is reversed and the case is remanded to the Jefferson Circuit Court for proceedings consistent with this opinion.

All concur, except STEPHENSON, J., who dissents in a separate opinion.

STEPHENSON, Justice, dissenting.

The majority views with alarm the cross-examination of James Lofton then proceeds to the conclusion that his credibility before the jury was destroyed thus requiring reversal of the case. To the bench and bar the conclusion of the majority opinion would appear to be proper. I also would agree that as portrayed and standing alone this would be unfairly prejudicial. However, this cross-examination did not occur in a vacuum and my curiosity leads me to review all the testimony of James Lofton, direct and cross. The majority opinion does not tell the entire story. When the direct-examination is considered, I am of the opinion the story told by this unsavory character would not be believed by any jury anywhere. Lofton's testimony on direct-examination justified the cross-examination condemned here.

To summarize the direct-examination, Lofton stated he was presently residing in the jail, that he had been convicted of robbery in Indiana and convicted of theft in Nevada. At this point the trial court gave the jury a *Cotton* admonition.

Continuing Lofton stated he had been in jail "waiting for trial for three years." Then he tells of meeting Kenny Blair for the first time and "developing a relationship." This relationship developed after an argument between Blair and a guard when Lofton "took up" for Blair. Lofton further stated, "I don't have anything. I lost my wife and children, and everything that was ever dear to me four years ago, and waiting for this trial here, this speedy trial."

Then Lofton stated Blair began to "confide in me. He respected that I would stand up for him." He stated that Blair told him about a murder charge.

"Well, he knew that I was being held here for robbery and murder, and he confided in me. I was standing tall, as you might say, this type of concept, and I can't really say what he was thinking, but his demeanor reflected that, that he wanted to win my friendship. He was trying to act like a bad guy, and I don't care for that type of thing.

"He started in Missouri. He told me how rough he is. He beat a man's brains with a car tool, and about stabbing a guy in Illinois, and then about this crime—."

Lofton then testified how Blair told him that he committed the kidnapping, robbery and murder, describing a general outline of the facts surrounding the crimes. Then Blair described how he "set up" Moore by giving Moore the car.

After other testimony and being asked if he had talked to the police about the effect of his testimony, he said:

"No. See, I'm going to the penitentiary, and what I'm doing now is called a snitch, and I will probably die for this. I can't really win. My wife won't bring my children to see me, and I love them. I'm a man. I've got my dignity. I think truth is an important thing, and maybe they will know this some day."

Then he stated that Moore asked him if he would testify as to what he was told by Kenny Blair.

It is in this context that the cross-examination condemned by the majority opinion is commenced. After Lofton's ploy to gain sympathy for being denied a speedy trial and being held in jail for three years it seems reasonable to me that the Commonwealth should be allowed to point out that escape from jail was one of the reasons for the delay and the trial on the Indiana cases also accounted for the delay.

There was no objection to the question about being convicted of robbery, murder and arson in Indiana and although partly irrelevant, considering the whole testimony, was not unfairly prejudicial.

There was no objection to the question regarding the trial in this state for kidnapping, robbery and murder. In any event Lofton on direct had testified that he was being held for robbery and murder. The rule was in effect and Lofton could not have been aware that Moore had been asked if he knew what charges were against Lofton.

Lofton was further asked if he and Moore talked about "snitches" and answered, "yes, sir." He did not consider Blair a snitch and expressed surprise when informed that Blair had "turned Moore into the police."

Later he stated: "I'm subject to die. I know Brian Moore didn't commit that murder. That boy down there told me he is the one that killed the man."

During the recross-examination, a part of which is set out in the majority opinion, it was suggested that Lofton had nothing to lose by testifying for the reason that his Indiana convictions were for life and twenty-one years. His answer was that, "I have something to gain, a matter of dignity sir." The questions then asked regarding the Indiana murder convictions, which are set out in the majority opinion, were without objection. The only response of defense counsel was the reference to "axed her to death, etc." This was not an objection or request for admonition, but a request for a mistrial.

Curiously enough *Cotton* is invoked to condemn the cross-examination although the trial court and counsel approached the problem as to a showing of motive or bias. In my view the cross-examination enlarges or explains matters Lofton testified to on direct. In my opinion the damage to Lofton's credibility was done by Lofton himself on direct. This testimony may have been the chief proof on which Moore depended, a defense of desperation. Kenny Blair is referred to as a major Commonwealth witness. The principal Commonwealth witness was Moore himself, confessing to the crimes. Lynn Thompson's testimony was more important than that of Blair. Also the physical evidence, fingerprints, soil matching murder scene, and proof from a test of Moore's hand that he had fired a gun, was not explained away by Lofton's story. I do not believe the cross-examination of Lofton was reversible error when considering the entire record. While we consider errors not objected to in a capital case, I can say if a portion of this cross-examination was erroneous (the Indiana murder conviction), it was cancelled out by Lofton's direct.

In addition I feel that the directions in the majority opinion to permit the Reverend Wilson to testify is bad policy. The statute on mitigating circumstances is mandatory, but there is a limit. The trial court should have some discretion in matters that are cumulative. Wilson's concern was to instruct the jury how they should consider the death penalty. He had been told Moore's age and lack of criminal background. This evidence was in the record and no useful purpose could be served by

**440**

holding the trial court erroneously refused to permit Wilson's testimony on this matter.

As to the remarks of the prosecutor in closing argument, condemned in the majority opinion, they were not objected to in order to have a ruling and a possible admonition.

The tape of Moore's interrogation was introduced in part to contradict portions of Moore's testimony. The court ruled out permitting the jury to hear the entire tape for the reason it contained a great deal of irrelevant material. It also contained a statement about Moore's involvement in the crimes according to the detectives who testified at length about Moore's statements to them while the interrogation was being taped. Defense counsel did not object probably for the reason he knew all of this, and in any event in view of the entire testimony, this could not have been prejudicial to Moore.

I am of the opinion Moore received a fair trial and that his convictions should be affirmed.

Accordingly I dissent.