**Frederick DUNN, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 84–CA–360–MR.**

Court of Appeals of Kentucky.

Oct. 26, 1984.

As Modified Nov. 9, 1984.

Rehearing Denied Dec. 21, 1984.

Discretionary Review Denied and Opinion Ordered Published by Supreme Court May 15, 1985.

Daniel T. Goyette, Jefferson District Public Defender, J. David Niehaus, Deputy Appellate Defender, Louisville, for appellant.

David L. Armstrong, Atty. Gen., Suzanne Guss, Asst. Atty. Gen., Frankfort, for appellee.

Before CLAYTON, LESTER and WHITE, JJ.

LESTER, Judge.

This is an appeal from a judgment entered upon a jury verdict finding appellant guilty of receiving stolen property valued in excess of $100. Pursuant to a plea of guilty to persistent felony offender, the sentence was enhanced to ten years imprisonment.

On January 19 and 20, 1984, Harvey Copeland lived in an apartment directly above one occupied by Barbara Fisher on Gardiner Lane in Louisville. On the morning of the 19th, Copeland heard some noise emanating from the quarters below him and, knowing Fisher was normally at work at that hour, looked out the window. From his vantage point, Copeland observed a blue station wagon bearing the words "Community Taxi" and a man placing an object in the vehicle, the article being covered by a green army jacket. The upstairs tenant wrote down the license number and called the police. Upon arrival, the officer got a further description of the station wagon and he also learned that two to three black men were involved, two of whom were wearing green army field jackets. A police radio "pickup" was issued.

Barbara Fisher was notified at her place of employment about 10:00 A.M. on the morning of the break-in and she went directly to her apartment, wherein she found a number of items missing, including jewelry, and she notified police. Although the appellant would have us believe otherwise, Fisher advised the police of the missing items on the 19th because they had already been listed on a report which the apprehending officer read on the morning of the 20th before he arrested appellant.

At approximately 8:00 A.M. on January 20, Detective Jose Fernandez, while on Brownsboro Road, observed the subject station wagon containing three black males, the driver of which, Chester Smith, originally a codefendant in this case, the officer recognized. Smith was wearing a green army field jacket. Backup officers were called, one of whom was Patrolwoman Bonnie Wintergerst. The vehicle having been stopped and the backup unit on the scene, Officer Wintergerst thereupon ordered appellant Dunn from the back seat and, after observing a bulge in his pocket, patted him down. This frisk resulted in the officer finding the jewelry, discussed above.

Without extensive elaboration, the sequence of events that followed the foregoing were that the three suspects were taken to the police station; advised of their rights and interrogated. Dunn denied participation in the theft but admitted helping in disposing of the items; and, after consultation with the other two suspects, appellant agreed to take the police to his apartment to recover articles stolen in other burglaries. Dunn, Geno Robinson, a co-suspect, and Detective Fernandez went to the dwelling and at that point appellant went about the apartment, picked up the property, and gave it to the police. There was no search, in the traditional sense, made by the officer. In the meantime, Fisher had gone to the station and identified her belongings.

A suppression hearing was held whereat the appellant objected to the stopping of the vehicle, the pat-down search and admission of the fruits thereof, the jewelry, the search of the apartment and certain oral and written statements made by Dunn. Only the oral statement was determined to be inadmissible. At the trial, the co-suspects testified against Dunn.

On appeal, complaint is made of the errors allegedly resulting from the suppression hearing in that Dunn's arrest, the search of appellant and seizure of the jewelry and the refusal to suppress the written statement of appellant were improper, the search of Dunn's apartment was based upon involuntary consent, and a mistrial should have been declared because of certain remarks made by the prosecutor in opening statement.

We address the arrest of Dunn first. Appellant admits that all the events through the stopping of the station wagon were proper but then argues that there was no probable cause to arrest Dunn because:

Fernandez and Wintergerst could not have known any jewelry was stolen.

At the time of the stop Dunn was not connected to the crime.

Even though jewelry was found in Dunn's pocket it could not be connected with the burglary.

Barbara Fisher didn't know the jewelry was stolen until the afternoon of the 20th.

Based upon the foregoing, it is urged that even a short term detention or investigative stop was illegal within the confines of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), and *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). We cannot accept the argument for it is based upon what appellant perceives the facts to be, not what the record shows.

In the first place, the police were aware that the suspects could have been three in number rather than two as of the 19th. Barbara Fisher reported jewelry stolen on the 19th and not the 20th, for prior to the stop (about 8:00 A.M. on the 20th), Detective Fernandez read about the loss of jewelry on a report. What appellant wants us to believe is that since Fisher did not identify the recovered jewelry until the afternoon of the 20th, she did not report its loss until that time. The record does not support his interpretation of the facts.

It is obvious from the appellant's view of the facts that he does not agree with our interpretation thereof but we need not fashion a different perspective in order to find the trial court correct in its suppression hearing order. We say this based upon what Dunn admits as true. Even though appellant does not deny that the witness Copeland initially told the police that there could have been three suspects at the scene of the burglary, he contents himself with pointing out that rudimentary *descriptions* of two were given. He does not dispute the description of the vehicle and agrees that there was ample justification for the actions of the law enforcement agents up to the point of stopping the station wagon on January 20th. Thereafter, Dunn emphasizes lack of probable cause. We now turn to the legal principles.

██ What disturbs most criminal defendants and their representatives is that the so-called security from invasion of privacy of their persons, luggage, vehicles, shipping containers, etc. has been consistently liberalized, or eroded, if you will, with the exception of private residences. Even this last category has come under closer scrutiny recently. The pendulum of conservatism in criminal jurisprudence started in its present direction with *Terry, supra,* and continues to swing in *Massachusetts v. Sheppard,* 468 U.S. ——, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). The many recent decisions of the United States Supreme Court have revamped the principles of search and seizure law, and, as applicable to this case, have reaffirmed some older ones. In *Michigan v. Long,* 463 U.S. 1032, 1045, 103 S.Ct. 3469, 3478, 77 L.Ed.2d 1201, 1217, (1983), the Supreme Court in discussing *Terry* said:

Examining the reasonableness of the officer's conduct in *Terry,* we held that there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." 392 US, at 21, 20 L Ed 2d 889, 88 S Ct 1868 [at 1879], 44 Ohio Ops 2d 383 (quoting *Camara v. Municipal Court,* 387 US 523, 536–537, 18 L Ed 2d 930, 87 S Ct 1727 [1734–1735] (1967)). Although the conduct of the officer in *Terry* involved a "severe, though brief, intrusion upon cherished personal security," 392 US, at 24–25, 20 L Ed 2d 889, 88 S Ct 1868 [at 1882], 44 Ohio Ops 2d 383, we found that the conduct was reasonable when we weighed the interest of the individual against the legitimate interest in "crime prevention and detection," *id.,* at 22, 20 L Ed 2d 889, 88 S Ct 1868 [at 1880], 44 Ohio Ops 2d 383, and the "need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they lack probable cause for an arrest." *Id.,* at 24, 20 L Ed 2d 889, 88 S Ct 1868 [at 1881], 44 Ohio Ops 2d 383. When the officer has a reasonable belief "that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unrea-

sonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Ibid.*

Although *Terry* itself involved the stop and subsequent pat-down search of a person, we were careful to note that "[w]e need not develop at length in this case, however, the limitations which the Fourth Amendment places upon a protective search and seizure for weapons. These limitations will have to be developed in the concrete factual circumstances of individual cases." *Id.*, at 29, 20 L Ed 2d 889, 88 S Ct 1868 [at 1884], 44 Ohio Ops 2d 383. Contrary to Long's view, *Terry* need not be read as restricting the preventative search to the person of the detained suspect.

In two cases in which we applied *Terry* to specific factual situations, we recognized that investigative detentions involving suspects in vehicles are especially fraught with danger to police officers. In *Pennsylvania v. Mimms,* 434 US 106, 54 L Ed 2d 331, 98 S Ct 330 (1977), we held that police may order persons out of an automobile during a stop for a traffic violation, and may frisk those persons for weapons if there is a reasonable belief that they are armed and dangerous. Our decision rested in part on the "inordinate risk confronting an officer as he approaches a person seated in an automobile."

In footnote 11, referred to in the above quote, Justice O'Connor pointed out:

Although we did not in any way weaken the warrant requirement, we acknowledged that the typical "stop and frisk" situation involves "an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct in this case must be by the Fourth Amendment's general proscription against unreasonable search and seizures." *Terry, supra,* 392 US at 20, 20

L Ed 2d 889, 88 S Ct 1868 [at 1879], 44 Ohio Ops 2d 383 (footnote omitted). We have emphasized that the propriety of a *Terry* stop and frisk is to be judged according to whether the officer acted as a "reasonable prudent man" in deciding that the intrusion was justified. *Id.,* at 27, 20 L Ed 2d 889, 88 S Ct 1868 [at 1883], 44 Ohio Ops 2d 383. "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams,* 407 US 143, 146, 32 L Ed 2d 612, 92 S Ct 1921 [1923] (1972).

Thus, in the case at bar, we have three black males, two wearing green army jackets, stopped in a car identified as having been the burglary vehicle. It must be remembered that the neighbor reported three black males as being involved. When he was asked to vacate the car, Officer Wintergerst observed the bulge in Dunn's pocket. When asked upon redirect examination as to her opinion of the lump, she replied:

Q. Okay. Was it as big as or comparable to any kind of weapon that could of been in his pocket?

A. It could very easily have been.

Appellant argues that "Wintergerst never voiced any fear that appellant was armed ...." In the first place, no one queried her about her fears, and in the second place, we do not believe a police officer to have to be fearful in order to invoke the typical "stop and frisk" which involves the "entire rubric of police conduct—necessarily swift action predicated upon on-the-spot observations of the officer on the beat...." *Michigan, supra.* Moreover, if while conducting a legitimate pat-down of a stopped individual within *Terry* the officer discovers contraband other than weapons, he should not be required to ignore it, and the Fourth Amendment does not require its suppression. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Michigan v. Tyler,* 436 U.S. 499, 98

S.Ct. 1942, 56 L.Ed.2d 486 (1978); *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

■■■ As to the matter of probable cause, we alluded to the fact that the United States Supreme Court has reaffirmed some old principles and established new ones in recent decisions. In *Texas*, the Court, recalling a 1925 decision, opined:

As the Court frequently has remarked, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," *Carroll v. United States*, 267 US 132, 162, 69 L Ed 543, 45 S Ct 280 [288] (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. *Brinegar v. United States*, 338 US 160, 176, 93 L Ed 1879, 69 S Ct 1302 [1311] (1949). Moreover, our observation in *United States v. Cortez*, 449 US 411, 418, 66 L Ed 2d 621, 101 S Ct 690 [695] (1981), regarding "particularized suspicion," is equally applicable to the probable cause requirement:

"The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."

Applying the foregoing "flexible, common-sense standard ... as understood by those versed in the field of law enforcement," we find no error in the actions of the police officers in the stop and frisk of Dunn, the seizure of the jewelry and the determinations made by the court below.

Since the appellant alleges error in the admission of his written statement based upon what he terms his illegal seizure, and having found his seizure to be proper, then we need not address this contention. The same would be true concerning the argument regarding appellant's consent to search his apartment because he urges that illegal arrest and detention tainted the consent. As was pointed out in *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983):

We also agree that had Royer voluntarily consented to the search of his luggage while he was justifiably being detained on reasonable suspicion, the products of the search would be admissible against him.

Unlike Mark Royer, we have determined that Dunn was validly arrested and there being no question that he consented to the search, then his argument is without merit. Moreover, there is no evidence that any law enforcement agent actually searched the accused's quarters.

■■■ Appellant's final point is that he should have been granted a mistrial because the prosecutor made two references to the contents of an oral statement in her opening statement. Dunn urges that the statement had been suppressed. Insofar as the first reference is concerned, there is some conjecture that the Commonwealth was aware that the matter had in fact been suppressed, but in any event, unlike in Dunn's authority, *Moore v. Commonwealth*, Ky., 634 S.W.2d 426 (1982), an admonition was given which, absent bad faith, we believe cured the defect, if any.

■■■ As to the second remark, the mistrial motion was overruled and an admonishment given. The gist of the reference was that appellant told the police he knew about the burglary but that he did not participate in its commission. At the trial, both of Dunn's compatriots, Geno Robinson and Chester Smith, testified that Robinson *and Dunn* actually burglarized Fisher's apartment, detailing his (Dunn's) particular

acts in the enterprise. In view of the overwhelming evidence of guilt, both as to illegally entering the dwelling as well as receiving the stolen property, the error, if one there be, was harmless. *Blake v. Commonwealth* Ky., 646 S.W.2d 718 (1983).

The judgment is affirmed.

All concur.